Janet L. KRAUS, Plaintiff,

v.

The CLEVELAND CLINIC, Raymond J. Scheetz, M. D., and Constance White, M. D., Defendants.

No. C76–1110.

United States District Court, N. D. Ohio, E. D.

Nov. 29, 1977.

Frank K. Isaac, Marshman, Snyder, Seeley, Corrigan & Isaac, Keith A. Savidge, Cleveland, Ohio, for plaintiff.

Hugh M. Stanley, Jr., Arter & Hadden, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

On October 15, 1976, plaintiff Janet L. Kraus filed this lawsuit for medical malpractice against the Cleveland Clinic ("the Clinic"), and two physicians who were working at the clinic in the early 1970's— Dr. Raymond J. Scheetz and Dr. Constance White. On the basis of the undisputed facts hereafter recounted, these three defendants have moved for summary judgment.[1]

In late December 1971, the plaintiff developed red bumps and swelling on her legs and ankles which were diagnosed as symptoms of erythema nodosum by Dr. Raymond

1. "For the purposes of this motion, the Cleveland Clinic will admit that Drs. Scheetz and White acted as agents of the Clinic in their diagnosis and treatment of plaintiff." Footnote 3 on page three of the defendants' brief.

Scheetz of the Cleveland Clinic after he had examined Miss Kraus on March 23, 1972. Dr. Scheetz's March 29, 1972 prescription for this condition was to take the drug prednisone for a period of two weeks, at which time the plaintiff was to return for another examination.

At her next appointment on April 14, 1972, Dr. Scheetz continued the prescription for prednisone for an additional six weeks, at which time the plaintiff was again to return for further examination. The plaintiff had two further office appointments with Dr. Scheetz in 1972 and saw the doctor three times in 1973, at all of which appointments Dr. Scheetz continued the prescription to take prednisone at a specified dosage until the next examination. At the last of these appointments on November 30, 1973, Dr. Scheetz told Ms. Kraus to return for another examination in four month's time. When the plaintiff did return to the Clinic on April 9, 1974, she was examined by Dr. Constance White rather than by Dr. Scheetz.[2] Dr. White subsequently saw the plaintiff on October 9, 1974. Janet Kraus alleges in her deposition that at this October, 1974 examination, "[she] received a 500 tablet prescription (with one permissible refill) for the prednisone from Dr. White. At this time I informed Dr. White that I was leaving for California to work at a ski resort. She advised to take the drug for flare-ups, which I did." [3]

The plaintiff's final visit to the Cleveland Clinic was on October 25, 1974 at which time she was seen by a Dr. Roenigk (who is not a defendant in this lawsuit). His prescription for her, as reflected in his notations on the Clinic's clinical sheet, were to "Stop Pred.—except for severe flares [or "flare-ups"]." Thus the plaintiff was apparently told on her final visit to the Clinic on October 25, 1974 to continue the use of prednisone for flare-ups of her symptoms.

In the early part of 1975, Ms. Kraus's mother made an appointment for her daughter at the Cleveland Clinic for May 9, 1975. This appointment was made by Mrs. Kraus because "Janet was coming home [from California], and I thought in case she has a problem, in case there is an indication of some bumps, she would be able to follow through." Deposition of Mary Kraus at page twelve as quoted on page three of the plaintiff's brief. Upon arriving in Ohio, the plaintiff broke this May 9, 1975 appointment at the Clinic, and she has not been seen or treated by Drs. Scheetz, White, or other physicians at the Clinic since the October, 1974 examination. On February 20, 1976, however, plaintiff had filled one of the prescriptions for prednisone which Dr. Scheetz had given her, and she took twenty prednisone tablets at that time.

The heart of plaintiff's cause of action is found in the fifth paragraph of her complaint:

> 5. Defendants, Cleveland Clinic, Scheetz and White, negligently failed to follow the customary and usual skills and procedure in regular use by members of their profession, in that as the direct and proximate result of plaintiff's consumption of the Prednisone drug, plaintiff has developed Osteoporosis.

Plaintiff also alleges that "[d]efendants knew or should have known that extensive use of the Prednisone drug can result in Osteoporosis" and that the defendants failed to warn plaintiff of this possible side effect of the drug.

The contention of the defendants in their motion for summary judgment is that the plaintiff's cause of action was not timely filed and is now barred by the Ohio Statute of Limitations for Medical Malpractice.[4]

---

**2.** There is no explanation in this record why Ms. Kraus saw Dr. White rather than Dr. Scheetz at her Clinic appointments commencing on April 9, 1974.

**3.** Dr. White admits that she prescribed prednisone for the plaintiff's diagnosed erythema nodosum. Although Dr. White wrote a prescription for prednisone for the plaintiff, plaintiff never actually filled the prescription; instead, Ms. Kraus used the three refillable prescriptions written for her by Dr. Scheetz to obtain her prednisone.

**4.** The parties agree that the law of Ohio applies to this diversity case, both as to substantive legal issues, *Erie Railroad Co. v. Tompkins*, 304

**312**

There is no disagreement between the parties that the relevant statute of limitations for this action is that contained in O.R.C. § 2305.11(A), which provides that "[a]n action for . . . malpractice . . . shall be brought within one year after the cause thereof accrued . . . ." The plaintiff, however, contends that this statute of limitations had not run at the time of the filing of her lawsuit in October, 1976.

The defendants in their brief frame the issue in this case as follows:

WHETHER PLAINTIFF'S ACTION (WHICH WAS FILED ON OCTOBER 15, 1976), WITH RESPECT TO ANY OF THE DEFENDANTS, WAS COMMENCED WITHIN THE TIME PERIOD PRESCRIBED BY OHIO REV. CODE § 2305.11, WHERE (1) SHE WAS LAST TREATED BY DEFENDANT SCHEETZ ON NOVEMBER 30, 1973; (2) SHE WAS LAST TREATED BY DR. WHITE ON OCTOBER 9, 1974; (3) SHE WAS LAST TREATED BY DR. ROENIGK ON OCTOBER 25, 1974; AND (4) SHE BROKE A MAY 9, 1975 APPOINTMENT WHICH SHE HAD WITH DR. WHITE.

■ The Ohio Supreme Court has delineated the time at which a cause of action for medical malpractice accrues as follows:

Under R.C. 2305.11, a cause of action for medical malpractice accrues, at the latest, when the physician-patient relationship finally terminates. (*Gillette v. Tucker*, 67 Ohio St. 106, 65 N.E. 865; *Bowers v. Santee*, 99 Ohio St. 361, 124 N.E. 238; and *DeLong v. Campbell*, 157 Ohio St. 22, 104 N.E.2d 177, followed.)

Syllabus to *Wyler v. Tripi*, 25 Ohio St.2d 164, 267 N.E.2d 419 (1971).

The basis for the Ohio Supreme Court's holding that the statute of limitations for medical malpractice does not begin to run until after the patient-doctor relationship has terminated is explained in the case of *Gillette v. Tucker*, 67 Ohio St. 106, 65 N.E. 865 (1902):

It is the duty of the physician and surgeon to exercise due and ordinary skill, care and attention, not only in and about an operation which he decides to be necessary, but also, in the absence of a mutual understanding, or notice to the contrary, to render such continued further care and treatment as the necessity of the case requires; and he is liable for injuries and damages which proximately result from the want of such ordinary skill, care and attention.

Syllabus No. 2 to *Gillette v. Tucker, supra.*

■ As the *Gillette* court made clear in its opinion, ordinary medical care and skill must be exercised by a doctor in the decision to terminate a doctor-patient relationship, as well as during the continuance of that relationship:

So, continued attention to the undertakings, so long as attention is required, in the absence of any stipulation to the contrary, is equally an inference of the law, . . . and he [the doctor] is bound to use ordinary care and skill, not only in his attendance, but in determining when it may be safely and properly discontinued.

*Id.* at 124, 65 N.E. at 869. For as the *Gillette* court further explained, "It would impose upon her [the patient] an improper burden to hold, that in order to prevent the statute from running against her right of action, she must sue while she was following the advice of the surgeon and upon which she all the time relied." *Id.* at 129, 65 N.E. at 871.

■ In the case at hand, the plaintiff argues that since she refilled her prescription for prednisone in February, 1976, and took the drug at that time under the orders of the Clinic doctors, she was still under the care of those doctors, and therefore the doctor-patient relationship had not been severed within one year prior to the filing of this lawsuit. As Janet Kraus says in the affidavit submitted for the purposes of this motion, "During this time [since she left the

U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and as to the relevant statute of limitations, *Guar-* *anty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

State of Ohio after her last Clinic appointment in October, 1974] I still considered myself a patient of the doctors at the Cleveland Clinic and continued to take the prednisone they prescribed for me in accordance with their instructions. I did not consult any other doctors concerning my erythema nodosum condition until October, 1976."

The defendants, however, cite the court to the case of *Millbaugh v. Gilmore,* 30 Ohio St.2d 319, 285 N.E.2d 19 (1972) and argue that this case bars the plaintiff's claim as a matter of law. The defendants particularly rely upon Syllabus No. 1 to this opinion:

1. Where a surgery patient has a date for an appointment with his physician for post-operative care and fails to keep that appointment and declines to ever see his physician again, the physician-patient relationship is finally terminated no later than the day of the appointment which the patient failed to keep.

The defendants contend that this case is controlling in this action not only because it involved a patient's failure to keep a scheduled doctor's appointment, but also because the Ohio Supreme Court in the second syllabus of *Millbaugh* held that the fact that the patient in that case took medicine prescribed by his doctor after the date of the cancelled appointment did not prevent the running of the statute of limitations. This court, however, finds the *Millbaugh* decision distinguishable.

In *Millbaugh,* the Ohio Supreme Court described the cancelled appointment as "post-operative care," i. e., as part of the recommended post-surgery care required by the doctor.[5] The court further explained its decision:

The taking of the medicine in such an unsupervised manner neither afforded

Dr. Gilmore an opportunity to correct any errors on his part, nor provided a basis for the full treatment contemplated in a physician-patient relationship. Although, as plaintiff states in his brief, he was acting under Dr. Gilmore's advice in taking the medicine, he was, by his own conduct, no longer Dr. Gilmore's patient at that time.

30 Ohio St.2d at 322, 285 N.E.2d at 21.

In this case, however, Janet Kraus had not been operated on by any doctors at the Cleveland Clinic and the doctors did not ask her to return to the Clinic for further check-ups or examinations after her October, 1974 appointment. Instead, Miss Kraus was sent from the Clinic with prescriptions for the drug prednisone and was apparently told that she should use the drug for any flare-ups of her illness. Although earlier in the course of her treatment Dr. Scheetz had told the plaintiff to return for examinations as to the course of the prednisone treatment, she was given no such instructions in October, 1974. She was instead sent from the Cleveland Clinic with prescriptions which would have allowed her to obtain several hundred tablets of prednisone, the extensive use of which drug Drs. White and Scheetz have admitted they knew "could cause an adverse reaction in a patient, including an adverse reaction of osteoporosis."

The court, therefore, finds on the present record that the May 9, 1975 Clinic appointment scheduled by the plaintiff's mother does not bar the plaintiff as a matter of law from recovery in this lawsuit. The fact that Mrs. Kraus, or any other person for that matter, made an appointment for Janet Kraus at the Clinic in no way precludes the plaintiff's recovery under the *Millbaugh* decision.[6] The doctors at the Clinic did not

---

5. *Millbaugh* and *Wyler v. Tripi, supra,* as well as the three cases cited in the syllabus to *Wyler* (*Gillette v. Tucker, supra, Bowers v. Santee,* 99 Ohio St. 361, 124 N.E. 238 (1919), and *DeLong v. Campbell,* 157 Ohio St. 22, 104 N.E.2d 177 (1952)), involved malpractice actions based upon allegedly negligent surgery. These were therefore cases in which one would expect the "full treatment contemplated in a physician-pa-

tient relationship," *Millbaugh, supra,* 30 Ohio St.2d at 322, 285 N.E.2d at 21, to include some form of "post-operative care."

6. The defendants have not proved on this record "the refusal of a patient to submit to further treatment by a physician," as was found in *Millbaugh,* 30 Ohio St.2d at 322, 285 N.E.2d at 21. The circumstances surrounding the making and cancellation of the May 9, 1975 ap-

schedule this appointment, nor have they stated in their affidavits that they were planning to use this appointment as a time at which they could monitor the continuing effects of prednisone on the patient. It is not even stated in this record that the Clinic doctors, as opposed to staff personnel, were aware that the appointment for Miss Kraus had been made.

The court also finds it significant that the malpractice alleged in this case concerns the prescription of prednisone, the taking of which drug is also argued to have extended the doctor-patient relationship. Thus this is not a case in which a surgery patient seeks to extend the doctor-patient relationship on the basis of drugs prescribed by a doctor that are perhaps not directly related to the allegedly negligent surgery. The drugs prescribed for the patient in this case are not only alleged to have extended the doctor-patient relationship, but are also the basis of the alleged malpractice itself.[7]

Dr. Scheetz gave the plaintiff refillable prescriptions that entitled her to obtain many hundreds of tablets of prednisone, admittedly knowing the possible side effects of the drug. Dr. White then continued this treatment and gave the plaintiff an additional prescription for prednisone while also admittedly knowing of the possible side effects of that drug. The plaintiff was then sent from the Clinic with prescriptions from both doctors allowing her to obtain refills of the drug, and was told that she should take the drugs for flare-ups of her original malady. The plaintiff states in her affidavit that she considered her doctor-patient relationship with Drs. Scheetz and

White to have continued until at least the spring of 1976. The court finds that a genuine question of fact is presented on this record as to the existence of a doctor-patient relationship within one year of the filing of this lawsuit. This question as to the termination of the doctor-patient relationship must therefore be determined at trial. *See Sheets v. Burman,* 322 F.2d 277 (5th Cir. 1963). The defendants' motion for summary judgment is therefore denied.

IT IS SO ORDERED.

pointment are thus described by the plaintiff in her deposition:

Q: Was another appointment made at the Clinic at any subsequent time, after October 25, 1974, for you to return to the Clinic for a visit?

A: One was made by my mother in May.

Q: Oh, she called in, in May?

A: Yes. Just on her own accord. When I came home to visit, she thought I might want to go, and I felt I had no severe symptoms and everything was fine and I didn't need to go.

P. 52 of the plaintiff's deposition, as quoted on pp. 7–8 of the defendants' brief. According to

this deposition testimony (upon which the defendants themselves rely), the plaintiff did not refuse further treatment scheduled by the defendant doctors, but merely cancelled an appointment made for her by her mother (without her knowledge) because she felt "everything was fine and I didn't need to go."

7. This case is thus not the typical surgery malpractice case in which, as noted by the Ohio Supreme Court in *Wyler,* "the termination rule extends the period of time at which the statute of limitations commences to run, *but does so by a factor which bears no logical relationship to the injury incurred."* 25 Ohio St.2d at 168, 267 N.E.2d at 421. (Emphasis added.)