Robert K. STEELE, as the natural father and next friend of Timothy R. Steele, and Robert K. Steele, Individually, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. F 75–27.

United States District Court, D. Alaska.

Oct. 23, 1978.

O. Nelson Parrish, Fairbanks, Alaska, for plaintiffs.

Steve Cooper, Asst. U. S. Atty., Fairbanks, Alaska, for defendant.

## OPINION

FITZGERALD, District Judge.

Timothy Steele is an eight year old boy whose father is a soldier in the United States Army. Timothy received medical care as a medical dependent at the Eye Clinic, Bassett Army Hospital, Fort Wainwright, Alaska, in 1973 and 1974. This litigation stems from a claim brought on Timothy's behalf by his father against the United States for loss of Timothy's right eye. The Federal Tort Claims Act[1] furnishes the required jurisdiction.

In October and November of 1973, Timothy's mother noticed Timothy's eyes crossing. On December 19, 1973, she took Timothy to the Eye Clinic, Bassett Army Hospital. There Timothy saw Dr. John Shank, an optometrist in charge of the clinic.

Dr. Shank made an extended examination and diagnosed Timothy's eye condition as an accommodative esotropia correctable by eyeglasses. Following his examination of Timothy, Dr. Shank wrote Mrs. Steele a prescription for eyeglasses and made an appointment for her to return Timothy to the clinic January 29, 1974, for a checkup.

During the January visit to the clinic Timothy's mother reported to Dr. Shank that she thought the eyeglasses were helping since Timothy's right eye was not crossing as frequently. However, Dr. Shank's clinical record noted "no good reflex" in Timothy's right eye. The optometrist wrote a different prescription for eyeglasses and instructed Mrs. Steele to make a follow-up appointment for Timothy four months after Timothy would begin wearing the new eyeglasses.

By early May, Mrs. Steele noticed that Timothy frequently removed his eyeglasses. When questioned Timothy told her that sometimes he wasn't able to see well. An appointment at the eye clinic was scheduled for Timothy on June 10. When Dr. Shank examined Timothy on that date he found vision in Timothy's right eye limited to light perception. At this point Dr. Shank

1. 28 U.S.C. § 1346(b). Plaintiffs' original complaint founded jurisdiction on the Federal Tort Claims Act but mistakenly cited the section as 1366(b).

made an appointment for Timothy with ophthalmologist, Dr. Bruce Wolf, close by in Fairbanks.

When Dr. Wolf examined Timothy on June 17th he found Timothy's visual acuity in the right eye limited to hand motion although capable of perceiving light. Essentially Timothy's right eye was blind. The doctor diagnosed Leucocoria, right eye, with right esotropia. In his medical opinion the inflammatory cause was a vitreous hemorrhage with possible involvement of toxocara canis or retinoblastoma. Since either disease was extremely serious, Dr. Wolf ordered a complete workup by a pediatrician hoping to rule out one or both. The pediatric workup proved negative and Dr. Wolf then arranged for ophthalmologist, Dr. William Kinn, as consultant. Dr. Kinn, a highly qualified ophthalmologist, before opening a practice in ophthalmology at Fairbanks spent ten years as a military medical officer. His last three years of military service were spent at Fort Wainwright where he was chief of ophthalmology and supervised the optometrists assigned to Bassett Army Hospital.

On examination of Timothy July 9th, Dr. Wolf and Dr. Kinn observed a retinal detachment of the right eye with a subretinal tumor. "Tumor" in this context was defined as a mass rather than a malignancy. Their diagnosis was possible retinoblastoma, but toxocara canis was also to be considered. The doctors concluded specific tests were necessary so that the precise identity of the disease might be known.

Arrangements were made to airvac Timothy from Fairbanks to Letterman Army Medical Center at the Presidio in San Francisco. At Letterman, Timothy was examined July 12 by a team of medical doctors, including Dr. Michael Hogan who was internationally recognized in the field of ophthalmologic pathology.

On examination the medical team observed a retinal detachment involving a grayish yellow tumor. The doctors diagnosed the cause of the tumor as possibly retinoblastoma or toxocara canis. Eye condition at that point in time made it impossible to differentiate between either disease. Because of the danger of retinoblastoma, a particularly fast-spreading and life-threatening malignancy, the doctors recommended to Timothy's parents that his right eye be removed. Timothy's parents immediately consented to the operation and Major Bradley C. Black, a resident assigned to the ophthalmology unit at Letterman, performed the surgery.

After the eye was enucleated it was sent to the ophthalmologic pathology laboratory at the University of California, Berkeley, California, for examination. The laboratory report revealed total retinal detachment of the eye with giant reaction and massive disorganization of the retina. The pathological examination ruled out a retinoblastoma but concluded the cause of the disease to be granulomatous retinitis,[2] etiology unknown. Unlike as in most eye removals, an implant was not inserted into the socket of Timothy's right eye immediately following surgery as there was a substantial possibility that the pathology report might confirm retinoblastoma. The malignancy would necessarily require radiation treatment and a follow-up examination not possible with an implant. When the pathological report ruled out retinoblastoma Timothy was returned to surgery and an implant was placed in the socket.

Dr. Black continued to treat Timothy following the second operation until Timothy returned to Fairbanks. After Timothy returned to Fairbanks he was treated by Dr. Wolf who noted that Timothy's recovery was excellent with the exception of periodic socket inflammation.

Timothy returned in September to Letterman where a prosthesis was inserted into the eye socket with good cosmetic result. Probably the prosthesis will never appear similar to a natural eye since it could not be inserted immediately following the operation.

---

2. Retinitis is an inflammation which chiefly involves the retina. "Granulomatous" is a type of inflammation. Thus, the pathology conclusion was that of a general retinal inflammation of unknown origin.

It is claimed in this litigation that the optometrist, Dr. Shank, failed to provide adequate care required of an optometrist when he treated Timothy in December of 1973 and January of 1974.

## OPTOMETRIC RESPONSIBILITY

Dr. Shank graduated with a degree in optometry from Pacific University at Forest Grove, Oregon, in 1971. He was commissioned in the United States Army as a Captain in the medical services and during the summer of 1973 was assigned to Fort Wainwright, Alaska. In November of 1974 he left the Army and now is in the practice of optometry at Kodiak, Alaska.

When Dr. Shank made his first examination of Timothy's eyes on December 17, 1973, he recorded a brief history:

In addition he also tested Timothy's unaided vision using a standard AO chart (pictures) for children. The best possible visual acuity when measured with an AO chart is 20/30. Dr. Shank recorded Timothy's visual acuity 20/30 OD and OS (both eyes). After dilating Timothy's eyes he made an internal examination and noted:

Upon completing the examination, Dr. Shank concluded that Timothy's eye problem was caused by an accommodative esotropia[3] correctable by a prescription for eyeglasses. He did not think it necessary to refer Timothy to an ophthalmologist.

Dr. Willard Bleything, Dean of the College of Optometry, Pacific University, Forest Grove, Oregon, who was called as a government witness at trial, agrees with Dr. Shank. According to Dr. Bleything, the findings of Dr. Shank's December examination are entirely consistent with an accomodative esotropia, hence, there was no need to send Timothy to a medical doctor.

In his testimony Dr. Bleything touched on the scope of training provided in a school of optometry. A significant part of optometric training is given over to recognition of diseases in the eye. In this case no one questions the principle requiring optometrists to refer their patients to medical doctors once disease is detected in the eye. In Timothy's case, however, Dr. Bleything would distinguish between an active vitreous hemorrhage and an inactive vitreous hemorrhage. He classifies an inactive vitreous hemorrhage as a scar and suggests referral to a medical doctor is indicated only in the event that an active vitreous hemorrhage were detected. It is implicit by this reasoning that to Dr. Bleything a scar is not an indication of existing disease. Scar tissue, according to Dr. Bleything's opinion, when old or inactive, is typically black. This is consistent with Dr. Shank's testimony that the vitreous hemorrhage detected in his December examination was old because it appeared black or dark.

Actually a black or dark color in a vitreous hemorrhage has nothing at all to do with its age, but rather is a result of its

---

3. Esotropia, meaning pointing inward.

magnitude or extent. The black or dark color indicates a lack of reflected light from the retina behind the hemorrhage. Blood in a vitreous hemorrhage is not black; it is only the shadow that appears black. Indeed, as Dr. Black states in his deposition, an old vitreous hemorrhage would appear as white strands in the vitreous and settle to the lower part of the vitreous. And Dr. Kinn testified that he had personally observed hemorrhages in the vitreous more than a year old which were red in color. He explained that a hemorrhage would appear to be black because it was sufficiently thick with blood to absorb all the light reflecting off the retina during an examination, not because of an innate darkness of color.

The interrelationship between optometric and medical responsibility is discussed in considerable depth in the scientific text referred to at trial, *The Optometric Profession*, by Hirsch & Wick. The text notes that responsibility for recognizing eye disease has not always been a part of optometry, nor indeed is it now a part of optometric services in parts of the world outside of the United States and English speaking countries. In some European countries an optometrist is expressly forbidden to examine the eye to determine whether it is healthy or not.[4]

Some of the diseases which may be discovered by examination of the eye are brain tumors, diabetes, kidney disorders, hypertension, as well as some diseases caused by microorganisms such as tuberculosis. Optometrists study about these and other diseases in order to recognize eye manifestations of diseases. An optometrist should not attempt to complete a definitive diagnosis but recognize this responsibility is part of the practice of medicine. This principle is clearly stated in *The Optometric Profession*.

The difference between optometric and medical responsibility to the patient may be clarified by example. If an optome-

trist observes a hemorrhage in the fundus, he recognizes that it may be due to any of the diseases already enumerated. It also may have resulted from a vascular accident or from undue capillary fragility. The important consideration for the optometrist, however, is that he see and identify the hemorrhage. It is his responsibility to refer the patient to the appropriate medical practitioner for diagnosis and treatment of the disorder. The optometrist's understanding about disease is sufficient to recognize the various diseases that can cause hemorrhage. He does not attempt to differentiate between them. Medical technology has advanced so greatly in the past few decades that there are now many laboratory tests the physician can use in making the correct diagnosis. Disease is diagnosed by many procedures. The appearance of the eyeground is only one of them.

I am not persuaded with Dr. Bleything's reasoning that referral to a medical doctor ought to depend on whether the optometrist has diagnosed a vitreous hemorrhage as active or inactive. The authors, Hirsch & Wick, suggest in their text that the important consideration is that the optometrist be able to see and identify the hemorrhage. It then becomes his responsibility to refer the patient to a medical doctor for diagnosis and treatment. Since Dr. Shank detected the vitreous hemorrhage of the right eye during his December examination, it was his immediate responsibility to promptly refer Timothy to a medical doctor. In point of fact, ophthalmological services were then readily available to military personnel at Fort Wainwright and to their dependents under a federal contract with Dr. Wolf.

Dr. Shank was aware of symptoms other than vitreous hemorrhage which are of significance to an optometrist. Esotropia in a child of four, Timothy's age in 1973, is a serious matter. Dr. Black states that esotropia in a four year old child is very rare. Most cases of congenital esotropia caused

4. Hirsch, M. and Wick, R., *The Optometric Profession*, p. 17, Chilton Book Co.: 1968 edition.

by muscle imbalance develop before age two. This condition is correctable by an operation on the muscles of the eye. Accommodative esotropia, such as diagnosed by Dr. Shank in December, 1973, develops in most cases at age two to two and a half, although it occasionally develops as late as age four or five. This condition is correctable by eyeglasses and the esotropia usually corrects itself after eyeglasses are worn. But esotropia may also indicate some type of retinal or vitreous pathology in the visual axis. This will often involve a disease in the macula, the central part of the retina. This condition reduces visual acuity in the eye and as a result the eye turns inward. In Dr. Black's opinion the most important thing to rule out when a child does present an esotropia is retinal or vitreous pathology. But even more, when a vitreous hemorrhage is observed in a child, it is very important that retinoblastoma be immediately considered until that disease can be completely ruled out.

Dr. Wolf, who treated Timothy at Fairbanks before and after his hospitalization at Letterman, agrees with Dr. Black that Dr. Shank should have referred Timothy to an ophthalmologist in December. Dr. Wolf believes that referral to a medical doctor ought to have been made immediately when Dr. Shank learned of the esotropia from Timothy's mother. Dr. Kinn, who consulted with Dr. Wolf, also agrees that referral was indicated in December. Indeed, Dr. Zimmerman, an eminent ophthalmic pathologist, who testified for the government at trial, concurs that further investigation should have been undertaken at the time the lesion was observed in Timothy's right eye.

■ I am persuaded from credible, convincing medical opinion, as well as the scientific publication referred to, that Dr. Shank failed to meet the standards required of his profession when he examined Timothy in December of 1973. He knew that Timothy presented an esotropia and in the course of his examination he observed a vitreous hemorrhage in the right eye. An optometrist's responsibility is to observe during his eye examinations any manifestation of disease visible in the eye. Upon detecting disease in the eye, it is then his obligation and duty to the patient to make known what the optometrist has observed. In such cases he may not undertake to diagnose the disease, but should inform his patient that the matter is beyond his competence and advise the patient to seek a qualified medical doctor. Certainly in January when Dr. Shank detected the poor reflex in Timothy's right eye, he should have sent Timothy to a medical doctor. Instead, he delayed making a referral to an ophthalmologist until after his last examination in June, 1974. By that time Timothy was essentially blind in his right eye, and by then the retina had pulled away from the rear of Timothy's right eye. As it was to turn out, nothing thereafter could be done to save the vision or to save the eye. Time had run out.

Several questions arise at this juncture. Was the disease which ultimately caused the eye to be removed present when Dr. Shank made his examination in December, 1973? What was the nature of the malady and could it have been diagnosed? Could the disease have been treated had it been timely discovered?

There is general agreement in the testimony of the physicians that the disease which brought about the removal of Timothy's right eye was present when Dr. Shank made his initial examination.

When Dr. Wolf examined Timothy in June, 1974, he diagnosed a vitreous hemorrhage with the possibility of either retinoblastoma or toxocara canis. The team of medical doctors who examined Timothy at Letterman Hospital in July considered four possibilities. The first was persistent hyperplastic primary vitreous, a congenital defect of the eye present at birth and generally noticed shortly after birth. With such a condition as persistent hyperplastic primary vitreous, the eye is usually a bit smaller. The front part of the eye is ordinarily not normal so there are distinguishing factors for that disease. The medical doctors at Letterman were able to rule out this possi-

bility. They were also able to rule out a vitreous hemorrhage as a cause since the vitreous of the eye was fairly clear when the doctors made their examination. The two remaining considerations related to some type of inflammatory response, most probably either toxocara canis or retinoblastoma.

Retinoblastoma is an extremely dangerous malignancy sometimes found in the eyes of young children. When diagnosed, retinoblastoma requires removal of the diseased eye to prevent the malignancy from escaping outside the eye, possibly through the optic nerve into the brain.

Retinoblastoma was ruled out in the University of California pathological report following examination of the eye after the operation. A negative finding of retinoblastoma eliminated any need for radiation treatment. In Dr. Black's medical opinion the cause of the inflammation of Timothy's eye was probably toxocara canis. Dr. Black observed that although the larva was never found in the few sectionings of the eye, it is known that the larva may disintegrate or completely disappear in the eye.

Toxocara canis is a parasitic round worm frequently found in dogs. The eggs of the parasite may be ingested by children playing in dirt and the eggs hatch in the intestines of the child into a larva. The larva bores through the intestinal wall and enters the blood stream and is disseminated to different parts of the body. In every instance, with possible rare exception, the parasite is not able to complete its life cycle in a human host and the larva dies without developing into an adult worm. The most common locations where it has been found are in the liver or the lungs. Inflammation of the eye by toxocara is fairly rare. But when it does appear it tends to result in a massive inflammation which usually involves the retina and sometimes may intrude into other structures inside the eye. The presence of toxocara in the body often leads to visceral larva migrans syndrome. The child can have a fever and may have some type of lung disorder, his liver may be enlarged and tender and there may be some abnormalities in certain blood tests. However, an ocular toxocara inflammation frequently occurs without a visceral larva migrans syndrome occurring and some studies suggest that in only three or four percent of ocular toxocara inflammation is the syndrome present. With ocular toxocara, so long as the larva remains alive, there is usually not much effect on the eye. There may be a local inflammation in the retina or a small whitish elevated lesion in the retina at the site of the larva or where it penetrated the retina, but the stage at which the parasite usually becomes very damaging is when the larva dies and decomposes. This leads to an extensive lesion in the eye eventually resulting in a massive scar. If the larva is able to work itself into the vitreous cavity of the eye, it brings about an even more severe inflammatory process.

Dr. Iris Krupp of Tulane University in New Orleans, Louisiana, is a widely renowned expert in the field of parasitology. She began her work on toxocara as a graduate student in 1954. Since then, she, in association with several opthalmologists, has done extensive work in the detection and treatment of toxocara. She developed a reliable serologic test for the detection of toxocara which was announced in an article [5] published in the "American Journal of Tropical Medicine" in May, 1974.[6] After examining the medical records, including the pathology report, in Dr. Krupp's opinion the probability was 90 percent that the disease in Timothy's right eye was toxocara.

Ophthalmic pathologist Dr. Lawrence Zimmerman was a principal government witness at trial. He agreed that the University of California pathological report required that retinoblastoma be ruled out as a cause. However, he noted Dr. Helenor Foerster, a widely known ophthalmic pa-

---

**5.** Hemoglutination Test for the Detection of Antibodies Specific for Ascaris and Toxocara Antigens in Patients with Suspected Visceral Larva Migrans.

**6.** Since the article did not appear until May, 1974, the physicians who treated or examined Timothy were probably not aware of Dr. Krupp's serological test.

thologist also performed a pathological examination on Timothy's eye. Dr. Foerster has published a number of important scientific papers, one of which presented the initial description of toxocara infection of the eye. Dr. Foerster prepared a pathological report in connection with a paper which she presented to the Western Ophthalmic Club. In her report Dr. Foerster observed many pigment-laden macrophages and giant cells in the retina. Dr. Zimmerman believed this was significant since it implied substantial bleeding into the eye, or alternatively, that a foreign body containing iron might have been introduced into the eye. He postulated that bleeding may have been brought about by several causes, including persistent hyperplastic primary vitreous. In addition, Dr. Zimmerman suggested another possibility of the cause of the inflammation might be a low grade bacterial infection. He did not, however, conclusively rule out toxocara as a possible cause but noted that the larva was not found in either pathological examination. Also, in Dr. Zimmerman's opinion the iron pigment described by Dr. Foerster in her pathological report would not be characteristic of toxocara infection. For these reasons he discounted toxocara as the cause.

Dr. Zimmerman concluded that in this instance it is unlikely that the cause of Timothy's eye inflammation can ever be reliably known, hence the doctor's final diagnosis was chronic sclerosing endophthalmitis, cause undetermined.

It is true that the larva was not found during pathological examination. But as Dr. Black explained, the larva may decompose and disintegrate. The University of California pathological report following examination of the eye was prepared by Dr. Joseph Eliason, an ophthalmologist. In his deposition testimony Dr. Eliason stated the pathological diagnosis was granulomatous retinitis, etiology unknown. As stated above, this is a general inflammation involving the retina. Toxocara canis characteristically causes this type of inflammation although other causes are possible.

In the course of the pathological examination, a technician prepared 30 to 40 sections from the eye. A section is less than a tenth of a millimeter and unless the entire eye is sectioned it is possible to miss the larva. In Dr. Krupp's opinion insufficient sections of the eye were examined to exclude the possibility that the larva was in the eye. Other possibilities suggested by Dr. Zimmerman that bleeding into the vitreous was caused by persistent hyperplastic primary vitreous were ruled out during the medical examination in July at Letterman, nor is there anything to suggest the possibility of a foreign metallic object as the cause of the inflammation.

I find on the basis of the testimony of the treating physicians, including Dr. Wolf, Dr. Kinn and Dr. Black, that toxocara canis was the probable cause of the inflammation in Timothy's right eye. The opinions of the treating doctors are substantially similar to the opinion of Dr. Krupp whose qualifications in this field are outstanding. I find in all probability the larva entered the eye through the retina prior to the time Dr. Shank made his examination in December of 1973. Probably the vitreous hemorrhage observed by Dr. Shank was caused by underlying lesion in the retina of the eye.

While it cannot be known with absolute certainty what an ophthalmologist would have done or been able to do if Timothy had been seen in December, 1973, Dr. Kinn testified that the ophthalmologist would have been immediately concerned with making a diagnosis. At that time the physician might have had some indication of a retinal lesion which would cause him to suspect either a granulomatous reaction or a retinoblastoma. The ophthalmologist would have been able to examine the microscopic details with specific instruments and if inflammatory cells were observed, the doctor could have concluded that an inflammatory reaction was present. In such circumstances a diagnosis of toxocara would be likely. Dr. Kinn explained that since the eye was functioning in December it would not have been prudent to remove the eye even if retinoblastoma was suspected. Rather, Dr. Kinn would recommend a therapeutic trial

of steroids be undertaken and if the response would be favorable, then the eye not be removed. But if the mass continued to grow despite the treatment and if retinoblastoma could not be ruled out, it would be necessary to enucleate the eye.

Although in Dr. Zimmerman's opinion there is no recognized treatment for toxocara canis, in fact according to Dr. Krupp, the use of steroids in treating toxocara appeared in the medical literature as long ago as 1961.[7] And since that time, Dr. Krupp maintains there have been numerous reports in the literature on the use of steroids. In her own right, Dr. Krupp has participated in treating approximately 20 cases involving ophthalmic toxocara. Her treatment for toxocara includes thiabendozole and steroids, generally used in combination. Thiabendozole is an anthelmintic medicine which kills the larva. The steroid is an anti-inflammatory agent which reduces the mass of inflammation generally associated with toxocara. In each of the cases in which Dr. Krupp participated treatment was able to arrest the loss of vision at the stage it was when the patient was first seen. Results of treatment can usually be observed within three to four weeks. In the event a patient does not respond to treatment, retinoblastoma may be indicated.

Dr. Black was also aware of several cases where inflammation of the eye was treated with steroids, and in isolated cases steroid treatment has decreased the inflammation, resulting in minimal scarring. But in Dr. Black's opinion in most instances toxocara is not seen by the ophthalmologist until it has been quite destructive. However, assuming that visual acuity in Timothy's right eye was 20/30 in December of 1973 and treatment with steroids was instituted, some vision might have been salvaged.

In Dr. Wolf's opinion if Timothy had been seen by an ophthalmologist in 1973, very possibly the eye could have been saved. Since a granulomatous inflammation is a cellular reaction to a foreign object, treatment would be taken to block the reaction. Steroids are a recognized form of treatment for granulomatous inflammation.

I find it probable that an ophthalmologist examining Timothy's right eye in December, 1973, would have diagnosed possible granulomatous reaction, toxocara canis or retinoblastoma. Although there was a lesion in the eye that to some extent impaired Timothy's vision, his visual acuity in the eye was 20/30, the best that could be measured on Dr. Shank's eye chart. The ophthalmologist under such circumstances would almost certainly institute a course of treatment involving steroids in order to reduce the inflammation. The treatment would have prevented further loss of vision and toxocara inflammation would have caused minimal scarring. They eye would have been saved.

Since the jurisdiction of the court is found under the Torts Claims Act, Alaska tort law controls. *Richards v. U. S.*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492; *U. S. v. English*, 521 F.2d 63 (9th Cir. 1975). The concept of liability arising out of negligence has been recently stated by the Alaska Supreme Court to be:[8]

It is elemental that in order for liability to be imposed in a negligence action, the plaintiff must establish a duty of due care owed him by the would-be defendant, a breach of that duty, and, finally, that the injury was proximately caused by the breach of duty. Generally speaking, the duty of due care or ordinary care is the duty to act with that amount of care which a reasonably prudent person would use under the same or similar circumstances.

*Leigh v. Lindquist*, 540 P.2d 492, 494 (1975).

7. By Schneider at the Oxnard Clinic.

8. The standard of care required of medical doctors, osteopaths, and dentists is found at AS 09.55.540. Optometrists were not included. In 1976 the statute was broadened to include all health care providers. Sec. 34, Ch. 102 SLA 1976. The amendment was limited, however, to actions filed after the effective date, May 29, 1976. Since *Steele v. U. S.* was filed August 20, 1976, the amendment is not applicable.

**330**

Dr. Shank's failure to promptly inform Mr. and Mrs. Steele of the vitreous hemorrhage in their child's eye and his accompanying failure to refer Timothy to an ophthalmologist was a breach of the standard of care owed to Timothy Steele and his parents. I find Dr. Kinn's testimony as the duty owed to be especially persuasive. Not only is he a board certified ophthalmologist who continually deals with optometric referrals, but Dr. Kinn was previously chief of the eye clinic at Bassett Army Hospital for three years. During those years, he was in charge of the optometrists at the eye clinic and had overall responsibility for all medical and optometric care at the clinic. Additional evidence of the breach of the standard of care is found in the established text *The Optometric Profession.* That authoritative work explicitly states that an optometrist is bound not to try to differentiate between pathologies such as hemorrhages. Instead, an optometrist must refer the patient to a medical practitioner for prompt examination.

I conclude that competent optometric practice required that Timothy's parents be notified and that the child be referred. The failure to inform and refer was not a "judgment call" but a violation of the governing principles of professional standards.[9]

Optometrists are trained to recognize symptoms of many diseases which may be discovered by eye examination. They are not permitted under recognized optometric standards to undertake a definite diagnosis but recognize this as the responsibility of a medical doctor.[10] Obviously, it is foreseeable that failure to refer to a qualified medical practitioner, when required to do so, will result in delay of diagnosis and the institution of treatment; so it proved to be in Timothy's case. At the time the referral was finally made to an ophthalmologist, it was too late. Because of the delay, the only action that could be taken was to remove the eye.

**9.** The Alaska Supreme Court has recently recognized that there are certain minimum levels of professional competence which must be adhered to in negligence actions, *Priest v. Lindig,* 583 P.2d 173, 179 (1978). The facts of the

 I conclude that the plaintiff is entitled to recover in this action from the United States for the loss of Timothy's right eye.

instant case indicate that base line principles of optometry were not followed.

**10.** *The Optometric Profession,* pp. 6, 17.