**In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION.**

**No. MDL 381.**

United States District Court,
E.D. New York.

Feb. 16, 1984.

David J. Dean, Dean, Falanga, Sinrod & Rose, Carle Place, N.Y., Stephen J. Schlegel, Schlegel & Trafelet, Ltd., Chicago, Ill., Thomas W. Henderson, Pittsburgh, Pa., Benton Musselwhite, Houston, Tex., Aaron Twerski, Hempstead, N.Y., of counsel, for plaintiffs.

Leonard Rivkin, Rivkin, Leff, Sherman & Radler, Garden City, N.Y., Philip Pakula, Townley & Updike, Wendell B. Alcorn, Jr., Cadwalader, Wickersham & Taft, William Krohley, Kelley, Drye & Warren, Thomas Beck, Arthur, Dry & Kalish, Richard Goldstein, Shea & Gould, of counsel, David R. Gross, Budd, Larner, Kent, Gross, Picillo & Rosenbaum, New York City, Paul V. Esposito, Lewis, Overbeck & Furman, Chicago, Ill., Morton B. Silberman, Clark, Gagliardi & Miller, White Plains, N.Y., for defendants.

Arvin Maskin, Gretchen Leah Witt, Civ.Div., Dept. of Justice, Washington, D.C., for third-party defendant, United States.

PRETRIAL ORDER NO. 91

PRELIMINARY MEMORANDUM ON GOVERNMENT LIABILITY

WEINSTEIN, Chief Judge.

Plaintiffs, Vietnam war veterans and members of their families, have sued defendant chemical companies to recover damages for injuries allegedly sustained as a result of exposure to Agent Orange in Vietnam. The defendants impleaded the United States under F.R.Civ.P. 14(a), claiming that if they were liable to the plaintiffs, the United States would be liable to them for some or all of the damages they would have to pay. This court, upon motion by the United States, dismissed the third-party complaint, relying upon *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). *In re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 762 (E.D.N.Y. 1980). No order of dismissal was, however, entered.

■ Defendants have moved for reconsideration of the dismissal, arguing that (1) the Supreme Court's decision in *Lockheed Aircraft Corp. v. United States*, —— U.S. ——, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983), implicitly overruled *Stencel* or at least indicated doubt on the Court's part as to its continued vitality and (2) even if *Stencel* is still good law the doctrine of that case does not apply to the independent claims of the wives and children of the veterans. For the reasons indicated below, upon reconsideration, the government's motion to dismiss the third-party complaint is granted only as to the claims by the veterans and the derivative claims by their family members. The government's motion to dismiss is denied as to the independent claims of the plaintiffs' wives and children.

## I. INTRODUCTION

Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), et seq., the United States waives its sovereign immunity from suits in tort, and vests jurisdiction over such claims exclusively in the United States District Courts. In *United States v. Yellow Cab Co.*, 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951), the Supreme Court held that, pursuant to the FTCA's language, that the United States is liable "under circumstances where * * * a private person would be liable to the claimant," 28 U.S.C. § 1346(b), the United States may be made a third-party defendant in those situations where a private party could have been impleaded.

■ Although the FTCA "waives the Government's immunity from suit in sweeping language," *United States v. Yellow Cab Co.*, 340 U.S. at 547, 71 S.Ct. at 402, the waiver is limited by the terms of the Act's exceptions. If a claim falls within any exception to the FTCA, sovereign immunity has not been waived and the court is without jurisdiction to hear the case. *United States v. Orleans*, 425 U.S.

807, 814, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976). One of those exceptions was recognized by the Supreme Court in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). That case and subsequent cases interpreting it hold that a member of the armed forces cannot sue the government in tort for injuries which "arise out of or are in the course of activity incident to service." *Feres,* 340 U.S. at 146, 71 S.Ct. at 159. This judicially created exception was based on three grounds:

1. The existence of a separate, uniform, comprehensive no-fault compensation scheme for members of the armed forces administered by the Veterans' Administration, similar in effect to workers' compensation plans;

2. The adverse impact on military discipline and effectiveness were servicepersons allowed to sue the government and;

3. The distinctively federal nature of the relationship between the United States and members of the armed forces which would make it unfair and irrational to have "the Government's liability to members of the armed services dependent on the fortuity of where the soldier happened to be stationed at the time of the injury." *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 671, 97 S.Ct. 2054, 2058, 52 L.Ed.2d 665 (1977).

## II. CONTINUING VALIDITY OF *STENCEL*

In *Stencel,* the Supreme Court held that where *Feres* barred the serviceman-plaintiff from suing the government directly for his injuries, a defendant who was held liable to the plaintiff for those injuries could not require the United States to indemnify it for any damages it had to pay. The court examined all three legs of *Feres* and found them as applicable to the impleader action as to a direct suit.

*Stencel* was the first of several cases dealing with the question of whether the United States may be held liable under the FTCA as a third-party defendant for injuries to a plaintiff government employee when that employee would be barred from suing the United States directly. In those cases, the Supreme Court and the lower federal courts have ground down the rationales of *Feres* and *Stencel* to the point where the defendants strongly contend that *Stencel*'s holding is no longer regarded by the Supreme Court as viable.

The first sign of erosion appeared in *Weyerhaeuser S.S. Co. v. United States,* 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963). That case arose out of a collision between a vessel owned by the United States and one owned by Weyerhaeuser. A civilian employee of the United States who was injured in the collision while on board the government vessel recovered damages from Weyerhaeuser which sued the United States to recover the amount it paid. The Supreme Court held that although the employee would have been barred by the Federal Employees' Compensation Act, 5 U.S.C. § 751, et seq., from suing the United States directly, Weyerhaeuser could nonetheless recover from the United States the money it had paid to the employee.

*Weyerhaeuser* clearly implicated the first leg of *Feres* in that, like the Veterans' Benefits Act which covered the military serviceman in *Feres,* the Federal Employees' Compensation Act is a separate, uniform, comprehensive no-fault scheme similar to workers' compensation schemes. *Weyerhaeuser* was even stronger than *Feres,* for, unlike the Veterans' Benefits Act, the FECA contains an explicit "exclusivity provision" barring suit by an employee against the United States for injuries compensable under the FECA. Thus, if the existence of the VBA justifies barring a suit against the United States despite the lack of an exclusivity provision, the FECA *a fortiori* should have. The Supreme Court distinguished *Feres,* although it did not cite it, by emphasizing the long history of the divided damages rule in mutual fault collision cases in admiralty and concluding that given that history, the divided dam-

ages rule was not affected by FECA's exclusive liability provision.

*Ionian Glow Marine, Inc. v. United States,* 670 F.2d 462 (4th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983), was similar to *Weyerhaeuser* except that the injured employees were Naval personnel instead of civilians, the United States ship was a naval vessel, and the United States had conceded liability. Unlike *Weyerhaeuser,* therefore, the military discipline rationale of Feres was implicated, not just the "separate compensation scheme" rationale. The third rationale, the federal nature of the relationship, was, of course, not implicated since, as a suit in admiralty, federal law was applied. Faced with a clash between *Weyerhaeuser* and the divided damages rule on the one hand and *Feres-Stencel* on the other, the Fourth Circuit tipped the balance in favor of the former and allowed Ionian to recover from the United States the damages it had paid for injuries to military personnel. The court stated that while "it is ... beyond question that if the present suit were in the form of an indemnity suit under the FTCA it would be barred," since the suit was "a mutual fault collision case in admiralty under the long established rule of divided damages" it is not "affected by the *Feres-Stencel Aero* doctrine." 670 F.2d at 463.

The defendants rely heavily on the government's brief in *Ionian Glow* seeking certiorari in which it adverted to "the apparent inconsistency between *Feres* and *Stencel Aero* on the one hand, and *Weyerhaeuser* on the other, [as] a conflict that only this Court can finally resolve." Petition for a Writ of Certiorari in *United States v. Ionian Glow Marine, Inc.,* at p. 11. Whatever the implication in that brief of the government's concern about undermining *Feres,* denial of certiorari negates any conclusion about the Supreme Court's conclusion on the matter. *Ionian* is but a straw in the wind on the issue before us.

*Lockheed Aircraft Corp. v. United States,* —— U.S. ——, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983), also involved a variation on the *Weyerhaeuser* fact pattern.

The difference here was that the government employee, while a civilian, was killed in the crash of a C–5A aircraft while flying out of Saigon, rather than in a naval vessel. The administrator of the employee's estate recovered damages from Lockheed, the manufacturer of the aircraft. Lockheed, in turn, had impleaded the United States as a third-party defendant, asserting a right to indemnification under the Federal Tort Claims Act. As in *Weyerhaeuser,* the United States contended that the Federal Employees' Compensation Act barred not only any direct recovery by the estate, but also any indirect recovery through third-party liability. On the other side of the equation, the divided damages rule of admiralty which in *Weyerhaeuser* was used to justify allowing recovery against the United States as a third-party defendant was not applicable. Nonetheless, the Supreme Court allowed the indemnification claim, in the process explicitly erasing any legal difference between a third-party claim in admiralty and one not in admiralty. Realizing that this holding seriously called into question the "separate compensation scheme" rationale of *Feres-Stencel,* the Supreme Court noted in passing that *Feres* "rel[ied] primarily on the military nature of the action." 103 S.Ct. at 1038 n. 8.

The defendants contend that the only way to harmonize *Ionian Glow,* which held that defendants sued by military personnel for injuries suffered in the course of service may recover in admiralty from the government in indemnity or contribution, and *Lockheed,* which erased any distinction between admiralty and non-admiralty cases, is to conclude that *Stencel* is no longer good law. They attribute the footnote in *Lockheed* reaffirming *Stencel* to the Supreme Court's known reluctance to overrule an older case when the case before it does not require such action.

Defendants' arguments have some force, especially when viewed in light of the widespread, almost universal criticism of *Feres* by the lower federal courts and commentators. *See, e.g., Hinkie v. United States,* 715 F.2d 96, 97 (3d Cir.1983) ("We are forced

once again to decide a case where 'we sense the injustice ... of [the] result.'"); *Scales v. United States*, 685 F.2d 970, 974 (5th Cir.1982) (applying *Feres* "reluctantly" and "regret[ting] the effects" of the conclusion); *Hunt v. United States*, 636 F.2d 580, 589 (D.C.Cir.1980) ("the *Feres* doctrine clearly lives, although its theoretical bases remain subject to serious doubt"); *Veillette v. United States*, 615 F.2d 505, 506 (9th Cir.1980) (applying *Feres* "reluctantly"); *Peluso v. United States*, 474 F.2d 605, 606 (3d Cir.), cert. denied, 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973) ("If the matter were open to us we would be responsive to the appellants' argument that *Feres* should be reconsidered * * *"); Hitch, The Federal Tort Claims Act and Military Personnel, 8 Rutgers L.Rev. 316 (1954); Rhodes, The *Feres* Doctrine After Twenty-Five Years, 18 A.F.L.Rev. 24 (1976); Note, From *Feres* to *Stencel:* Should Military Personnel Have Access to FTCA Recovery?, 77 Mich.L.Rev. 1099 (1979).

Perhaps a pathbreaking appellate court might discern enough emanations of Supreme Court disquiet to predict that Court's future conduct in limiting *Feres. Cf. B.K. Instrument, Inc. v. United States*, 715 F.2d 713 (2d Cir.1983) (Friendly, J.) (anticipating Supreme Court's reversing itself in light of subsequent developments). Viewed from this level of the court hierarchy there appears no weakening in *Feres-Stencel* sufficient to apply the *Lockheed-Ionian Glow* theory of defendants. Although *Stencel* may rest on the very shaky foundations of *Feres*, both cases were at least implicitly reaffirmed as recently as this past June. *See Chappell v. Wallace*, — U.S. —, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). As to harmonizing *Lockheed* and *Ionian Glow*, in *Ionian Glow* the government conceded liability. There was therefore no need for the court to inquire into military decisions in order to hold the government liable. As a result, the second rationale of *Feres*, the deleterious effect judicial scrutiny would have on military discipline, was not implicated.

By arguing for both the application of the government contract defense and for the abolition of *Stencel*, the defendants have taken somewhat inconsistent positions: the government contract defense is premised, in large part, on the argument that it is unfair to hold defendants liable for acts that were done at the government's behest since the government itself is immune from liability. If defendants' argument to disregard *Stencel* is accepted, the government will not be immune and thus the rationale for the application of the government contract defense largely disappears. *McKay v. Rockwell International Corp.*, 704 F.2d 444, 449 (9th Cir.1983), cert. denied, — U.S. —, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984).

An argument can be made that the servicemen have, in effect, made a claim for post-discharge malpractice or failure to warn by the Veterans' Administration. The issue is not completely clear. It has already been dealt with by this court's somewhat dubitante rejection of the contention. *In re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 762, 777–779 (E.D.N.Y.1980). For the nonce we reaffirm that view, though as indicated below the lack of certitude on this as well as the *Ionian Glow* argument may have some implication on rulings at trial.

## III. INDEPENDENT CLAIMS OF FAMILY MEMBERS

Defendants further contend that even if *Stencel* is still good law, the government should be liable as a third-party defendant on the independent claims of the servicemen's wives and children. The government, in turn, responds that the *Feres* doctrine bars the claims because, they contend, the claims are "incident to service." *Feres*, 340 U.S. at 136, 71 S.Ct. at 159. The wives' contentions are that their husbands' exposure to Agent Orange damaged their husbands' sperm causing them to miscarry. The children claim that genetic damage to their fathers caused their own birth defects.

It is apparent, on the one hand, that under *Feres* a family member of a

serviceperson may not sue for injuries suffered by that serviceperson "incident to service." *See, e.g., De Font v. United States,* 453 F.2d 1239 (1st Cir.), *cert. denied,* 407 U.S. 910, 92 S.Ct. 2436, 32 L.Ed.2d 684 (1972); *Van Sickel v. United States,* 285 F.2d 87 (9th Cir.1960). Thus, a wife cannot sue the United States for the wrongful death of her serviceman husband if, had he survived, he would have been barred by *Feres* from suing. This is so even though, under state law, the wife's claim is technically independent of any claim by her husband's estate. *De Font,* 453 F.2d at 1240; *Van Sickel,* 285 F.2d at 91. This conclusion has been placed on the ground that it follows naturally from the three *Feres* factors discussed earlier: The serviceperson or his estate will collect benefits under the Veterans' Benefits Act and the spouse has therefore been compensated for the injury; a suit by a spouse or other family member would intrude into military affairs to the same extent as would a suit by the member of the military himself; the relationship between the serviceperson and the United States is no less federal because the plaintiff is not a member of the military, since the federal relationship between the government and the person suffering the injury should control.

On the other hand, it is clear that a civilian plaintiff may sue for his or her own independent injuries notwithstanding the fact that a serviceman family member whose suit would be barred by *Feres* was also injured in the same incident. Thus, for example, *Orken v. United States,* 239 F.2d 850 (6th Cir.1956), arose out of the crash of an Air Force plane into the quarters occupied by an officer, his wife and two children on the military base where he was stationed. All four were killed. The Sixth Circuit held that the officer's death was incident to service and barred by *Feres.* Nevertheless, the government properly conceded that the *Feres* principles did not bar the suits for the death of the officer's wife and children. Government Brief, at 3, *cited in* 1 Jayson, Handling Federal Tort Claims § 156 at 5–146.10. The action of the family members is permitted despite the fact that it involves the same intrusion into military affairs as would a suit by the serviceperson himself. *See also Stencel Aero Engineering Co. v. United States,* 431 U.S. 666, 676–77, 97 S.Ct. 2054, 2060, 52 L.Ed.2d 665 (1977) (Marshall, J., dissenting) (noting that under the Court's holding, "had the same malfunction * * * that caused the serviceman's injuries * * * also caused [injuries to a civilian], the injured civilian would unquestionably have an action under the Tort Claims Act against the government").

Recently, courts have been faced with suits that fall in between the two lines of cases described above. Most of them grow out of the exposure of servicemen to high doses of radiation from nuclear testing and the handling of radioactive material during and after World War II. The servicemen, their wives and children have sued the United States. The servicemen allege that they suffered various forms of cancer because of their exposure to the radiation; their wives alleged that because of radiation damage to their husbands' sperm, they miscarried; their children alleged that the radiation caused them to be born with birth defects. The claims are like the first line of cases described above in that their injury would not have occurred if not for the fact that the husband or father was exposed to the harmful substance. In that sense, the claims are "incident to service" and the claims of the family members are "derivative" of those of the serviceman. Like the second line of cases, however, the family members are not suing for the serviceperson's injury but for their own direct injury.

Although the district courts that have considered the issue have split, *compare Hinkie v. United States,* 524 F.Supp. 277 (E.D.Pa.1981) (action brought by serviceman's child for birth defects granted) and *Jessup v. United States,* CV–79–271 (D.Ariz. April 1, 1980) (refusing to dismiss suit by family members who contacted hepatitis from active duty servicemen) *with Lombard v. United States,* 530 F.Supp. 918 (D.D.C.1981) (action brought by serviceman's children for mutagenic damages

barred) and *Monaco v. United States*, C 79–0859, (N.D.Cal. October 31, 1979) (same), the circuit courts that have thus far been faced with the question have concluded, albeit reluctantly and with some dissent, that *Feres-Stencel* does bar the independent claims of wives and children for their own direct injuries. *Hinkie v. United States*, 715 F.2d 96 (3d Cir.1983); *Lombard v. United States*, 690 F.2d 215 (D.C.Cir. 1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 3086, 77 L.Ed.2d 1347 (1983); *Scales v. United States*, 685 F.2d 970 (5th Cir.1982); *Monaco v. United States*, 661 F.2d 129 (9th Cir.1981).

As noted, those circuit courts that have barred the claims of the wives and children have done so while severely questioning the justice of the result. Thus, for example, the Ninth Circuit panel in *Monaco* noted the "widespread questioning of the *Feres* exception." 661 F.2d at 132. As the Third Circuit in *Mondelli v. United States*, 711 F.2d 567, 569 (3d Cir.1983), put the matter: "[W]e sense the injustice to the child of the servicemen in the result. Rarely does the law visit upon a child the consequences of actions attributed to the parents." Similarly, the District of Columbia Circuit concluded: "[I]n barring the claims we are not without any considerable sympathy for the serviceman and his family. This is particularly true for the serviceman's children for whom there is at present no viable means of redress for the injuries they may have suffered." *Lombard*, 690 F.2d at 227. *See also*, Comment, The *Feres* Doctrine: Has it Created Remediless Wrongs for Relatives of Servicemen?, 44 Univ. of Pittsburgh L.Rev. 929 (1983).

In dismissing the suits, the appellate courts apparently assumed that, inasmuch as the plaintiffs were immediate relatives of the serviceman and the injury had its genesis in a claim barred by *Feres*, the "incident to service" test applied to the family member's claims. Because of this assumption, none of the courts analyzed in any depth the applicability of the individual *Feres* factors. Nor did they consider the applicability of those cases where the plaintiffs were both the serviceman and members of his family, all of whom were injured in a common accident. Yet the government has conceded in those cases that, although *Feres* may bar the suit by the serviceman, it does not bar the suit by the other members of the family for their own injuries despite the fact that "an action for damages by members of the serviceman's family would raise the same issues and take the same form as an action by the serviceman." *Mondelli v. United States*, 711 F.2d 567, 569 (3d Cir.1983).

The analysis of the Third Circuit in *Mondelli* is typical. After briefly discussing *Feres*, the court concluded that "an action for damages by the serviceman's daughter would raise the same issues and take the same form, as an action by her father .... At trial, the daughter would be required to contest the prudence of exposing her father to radiation. This examination is foreclosed by *Feres*." 711 F.2d at 569.

Similarly, the D.C. Circuit in *Lombard v. United States*, 690 F.2d 215 (D.C.Cir.1982), was caught up in the semantic distinction between "derivative injury," which is barred by *Feres*, and "direct injury" to family members and did not consider the applicability of the *Feres* factors.

The government contends that this court is precluded from examining the *Feres* factors, citing the Supreme Court's statement that " 'courts are ill-equipped' to assess the impact of a particular suit on military discipline." *Chappell v. Wallace*, —— U.S. ——, 103 S.Ct. 2362, 2368, 76 L.Ed.2d 586 (1983). This contention adds nothing to the argument. While courts may be "ill-equipped" to assess the impact of a suit on military discipline, they are surely well-equipped to assess the applicability of the *Feres* factors to a particular suit. Were this not so, anytime the *Feres* bar was arguably implicated and the government objected to the suit on this ground, a court would have to dismiss the suit because "courts are ill-equipped" to assess the impact of a particular suit on military discipline.

To fulfill the mandate of *Feres*, this court must analyze each of the three *Feres* factors as they apply to this litigation. In doing so it will not be amiss to bear in mind the liberal attitude of the Supreme Court towards Federal Tort Claims Act interpretations reflected in *United States v. Yellow Cab Co.*, 340 U.S. 543, 554, 71 S.Ct. 399, 406, 95 L.Ed. 523 (1951).

> We think that the congressional attitude in passing the Tort Claims Act is ... accurately reflected by Judge Cardozo's statement in *Anderson v. John L. Hayes Construction Co.*, 243 N.Y. 140, 147, 153 N.E. 28, 29–30: 'The exemption of the sovereign from suit involves hardship enough, where consent has been withheld. We are not to add to its rigor by refinement of construction, where consent has been announced.'

This, we may recall, was a statement made during the same term, but after *Feres* was decided.

The first rationale of *Feres* is that the plaintiff military personnel are compensated for their service-related injuries by a uniform, comprehensive, no-fault compensation scheme. *Feres*, 340 U.S. at 145, 71 S.Ct. at 159. Although, as noted, this rationale has been called into question by the Supreme Court's decision in *Lockheed v. United States*, —— U.S. ——, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983), to whatever extent it is still valid, it does not apply to the independent claims of the wives and children. That group will not be compensated by the Veterans' Benefits Act for their own injuries. Allowing them to sue will therefore not "circumvent the limitation" on compensation of that Act. On the contrary, allowing such a suit would fulfill "[t]he primary purpose of the [FTCA], [*viz.*,] to extend a remedy to those who had been without." *Feres*, 340 U.S. at 140, 71 S.Ct. at 156. This point was apparently overlooked by this court in tentatively deciding to dismiss third-party claims against the government. It relied heavily on the Veterans' Administration compensation scheme without recognizing that the Veterans' Administration normally supplies neither medical nor compensation benefits for family members who themselves suffer physical injuries. *In re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 762, 770 (E.D.N.Y.1980).

The second rationale given by *Feres*, and the one now apparently regarded by the Supreme Court as the main justification for its holding in that case, *see Chappell v. Wallace*, —— U.S. ——, 103 S.Ct. 2362, 2365, 76 L.Ed.2d 586 (1983), is the possible harmful effect on military discipline and effectiveness of allowing such a suit. As the Supreme Court has stated, courts must not allow suits by soldiers to "disrupt[ ] ... '[t]he peculiar and special relationship of the soldier to his superiors' that might result if the soldier were allowed to hale his superiors into court." *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 676, 97 S.Ct. 2054, 2060, 52 L.Ed.2d 665 (1977), (Marshall, J., dissenting), *quoted in Chappell v. Wallace*, 103 S.Ct. at 2367.

■ The mere fact that the judgment of military officers may be questioned in a court of law is not sufficient ground for application of *Feres*, although, as discussed *infra*, it may bring other bars to suit contained in the FTCA into play. Were this not so, civilians could never sue the United States for injuries resulting from military negligence. In such suits, courts grant the civilians' claims without even discussing the effects of the suit on military discipline. *See, e.g., Bridgford v. United States*, 550 F.2d 978 (4th Cir.1977); *Williams v. United States*, 435 F.2d 804 (1st Cir.1970); *Arrendale v. United States*, 469 F.Supp. 883 (N.D.Tex.1979); *Steele v. United States*, 463 F.Supp. 321 (D.Alaska 1978). *See generally* Note, The Effect of the *Feres* Doctrine on Tort Actions Against the United States by Family Members of Servicemen, 50 Fordham L.Rev. 1241, 1244 (1982). The fact that an officer might refrain from giving an order to the soldier because a civilian might ultimately sue the United States is so ephemeral and far-fetched that it is given no weight at all in determining the limits of *Feres*. To support mili-

tary discipline, it is enough to preclude suit against the government based upon injuries to members of the armed forces.

At the other end of the spectrum, a few courts have gone so far as to hold that as long as the plaintiff was a serviceman subject to military discipline when the injury occurred, the claim is barred by *Feres* even if the serviceman was not performing military duties when injured. *Miller v. United States,* 643 F.2d 481 (8th Cir.1980) (wrongful death action on behalf of serviceman killed on base while moonlighting barred); *Coffey v. United States,* 324 F.Supp. 1087 (S.D.Cal.1971), *aff'd per curiam,* 455 F.2d 1380 (9th Cir.1972). *But see Hale v. United States,* 416 F.2d 355 (6th Cir.1969) (*Feres* only bars injuries that arise out of or in the course of military duty); *Downes v. United States,* 249 F.Supp. 626 (E.D.N.C.1965) (requiring a nexus between the injury and military discipline).

■ The cases demonstrate that the mere possible effect of a suit on the maintenance of military discipline is not sufficient to bring the *Feres* bar into play; rather, it is the *degree* of that effect that is important. Disregarding for a moment those cases involving allegations of genetic damage, in measuring that degree, the two critical factors have been the status of the plaintiff and how the claim arose. If the plaintiff is a serviceman, he will have difficulty distinguishing "the weight of authority tend[ing] towards [the] conclusion" that "every action for injuries sustained by an active duty serviceman while on base is barred by *Feres.*" *Miller v. United States,* 643 F.2d 481, 493 (8th Cir.1980). *Cf. Veillette v. United States,* 615 F.2d 505, 506 (9th Cir.1980) (noting the sharp distinction between military personnel and civilians).

By contrast, if the plaintiff is a civilian suing for his own independent post-service injuries, even if those injuries had their origin in plaintiff's military service, no court has denied the claim despite the intrusion into military affairs. Such suits follow two fact patterns. One falls into a malpractice model. Plaintiff was once a serviceman and the suit arises from injuries that he suffered incident to service. He is nonetheless allowed to recover if he can show a post-discharge failure to warn or an aggravation by the military by post-discharge negligence or an injury incident to service. *See, e.g., Broudy v. United States,* 661 F.2d 125, 128–29 (9th Cir.1981); *Everett v. United States,* 492 F.Supp. 318, 325–26 (S.D.Ohio 1980); *Thornwell v. United States,* 471 F.Supp. 344 (D.D.C.1979); *Schwartz v. United States,* 230 F.Supp. 536 (E.D.Pa.1964). Those suits denigrate *Feres* far more than the present one in that not only is the plaintiff allowed to sue for the same physical injury that he would have been barred from suing for under *Feres,* but the plaintiff is the same person who suffered the injury. Nonetheless, as long as the claim is technically independent of the *Feres*-barred claim, the plaintiff's current civilian status is allowed to control. This is so notwithstanding the fact that a trial might well have to inquire into military affairs and the circumstances surrounding the incident to service injury to almost the same extent as would a suit on the original injury: to determine what the military knew about the hazards (in the post-discharge failure to warn cases), or to determine how severely the plaintiff was injured (in the aggravation of injuries incident to service cases).

By way of contrast, in this suit, not only were the plaintiffs never in the military, not only are they not suing for injuries they suffered while in the military, but the injury they are suing for is physically distinct from the serviceman's injury. Plaintiffs' civilian status should, therefore, *a fortiori* control.

The second fact pattern is one where a civilian suffers an independent physical injury whose etiology is entwined with that of a serviceman's. Typical are situations such as that posed by *Orken v. United States,* 239 F.2d 850 (6th Cir.1956), and by Justice Marshall in his dissent in *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 676–77, 97 S.Ct. 2054, 2060, 52 L.Ed.2d 665 (1977). A civilian plaintiff is suing for his or her own injuries arising

from an incident in which a serviceman was also injured. The serviceman is barred by *Feres* from suing but, as the government concedes, the civilian is not.

The claims of the wives and children in this litigation are analytically identical to the second group of cases. They also have some characteristics of the first group of cases since failure to warn the serviceman after he was discharged from service may have contributed to a failure to take steps to prevent injury to wives and fetuses.

The following series of hypotheticals illustrate the legal problem. Assume the facts of the landmark products liability case, *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916). *See* 2, Harper & James, The Law of Torts 1535 n. 4 (1956). A soldier is sent in the general's Buick from Fort Hamilton to deliver a package to a ship at the Port Authority dock under the Brooklyn Bridge. In front of this courthouse a wheel breaks on a pothole and the parts fly off into a crowd of civilians. Can the soldier sue for his injuries? No, under *Feres*. Can his wife sue for loss of consortium or his ultimate death as a result of the accident? No, under *Feres*. Can the serviceman sue Buick? Yes. Can Buick implead the government? No, under *Stencel*. Can the civilian bystander sue the government for physical injuries he or she suffered when the wheel rim hit him? Yes, under the FTCA. Can the bystander sue Buick and can Buick then implead the government? Yes, under *Yellow Cab*. What if the injured bystanders were the wife and child of the soldier-driver, would that make any difference? No, as the government conceded in oral argument, since they were civilians independently physically injured. And it would follow, the government agreed, that if the wife and child sued Buick, Buick could implead the United States.

Let us now pursue a more esoteric hypothetical. Assume that a soldier had implanted in him by military medical personnel a prosthetic device which exploded, injuring the serviceman and a civilian passerby. The government concedes that al-though the serviceman may be barred by *Feres* from suing, the civilian would be able to sue. Again, it would make no difference if the passerby were the wife or child of the serviceman.

Assume now that instead of a prosthetic device, a chemical was sprayed on the serviceman's skin and a civilian was injured when the serviceman touched him and contaminated him with the chemical. Again, it is clear that although the serviceman may be barred from suit by *Feres*, the civilian would not be. The government concedes that it should make no difference if the civilian contaminated was a family member. *Cf.* M.P. Esposito, T.O. Tiernan & F.E. Dryden, Dioxins 223 (1980) ("symptoms [after exposure to 2,3,7,8-TCDD] such as chloracne can be passed by an exposed person to close associates such as family members through clothing, hands, or other close contacts."). Changing the hypothetical slightly, assume that the civilian contaminated by the chemical on the soldier was the serviceman's wife and the contamination was passed on through the contact entailed in the serviceman's intercourse with his wife. If the result were a miscarriage rather than an irritation on the skin of the spouse, the result would be no different—the wife could sue under the FTCA.

Finally, we pose the case of the chemical spray that causes not dermatological damage to the soldier and those with whom he has physical contact, but rather genetic damage. His intercourse with his wife results in a miscarriage because she has conceived a defective fetus as a result of the genetic damage to her husband's sperm, or in a child born with genetic damage. This last hypothetical is, of course, the case at bar. When asked to state a principled distinction between this last hypothetical, in which it contends the civilian wife or child would be barred from suing, and the previous one, in which it concedes a suit would be permitted, the government responds by emphasizing that the trial of the independent injury claims of family members would be indistinguishable, in terms of an

intrusion into military affairs, from trial of the serviceman's claims. This may be true, but it is irrelevant. It is indisputable that *Feres* would not bar the claim of a civilian who was exposed in the same manner as the serviceman despite the fact that such a trial would be indistinguishable from a trial of the serviceman's claims.

There is another reason why the military discipline argument seems tenuous here. We are called on to decide claims that arise out of military orders given some twenty years ago.

> The extended interval between the issuance of the orders and the appearance of the injuries dilutes the argument that an airing in court of the * * * family members' claims would occasion genuine harm to the command structure of the armed forces.

*Lombard v. United States*, 690 F.2d 215, 233 (D.C.Cir.1982) (Ginsburg, J., dissenting). While mere passage of time should not allow the filing of a suit that was not legally cognizable at an earlier date, claims for genetic damage, by their nature, generally do not arise for years after the serviceman's discharge. Thus, for example, in *Lombard v. United States*, 690 F.2d 215 (D.C.Cir.1982), the suit was not filed until over thirty-five years had passed since the serviceman's exposure to radiation. Similarly, in *Hinkie v. United States*, 715 F.2d 96 (3rd Cir.1983), suit was not filed until nearly thirty years after the allegedly harmful exposure.

There is every reason to include this litigation within that line of cases which holds that a civilian's suit does not affect military discipline to such a degree as to be barred by *Feres*. The "military discipline" leg of *Feres* should not bar the independent claims of the wives and children.

Defendants ask us to go a step further and hold that the only factor that should be considered is the status of the plaintiff, not whether the injury was suffered by a civilian or a serviceman. They correctly point out that, as noted, a civilian may sue the government for injuries suffered in an accident in which a serviceman was also injured despite the fact that the serviceman's suit would be barred by *Feres*. The only legally significant distinction between the civilian and the serviceman is the status of the plaintiff, not the degree of inquiry into military decisions. From this they conclude that they, as civilians, should be allowed to implead the United States for all of the plaintiffs' claims, not just those for miscarriages and birth defects, despite the fact that the servicemen themselves would be barred by *Feres* from suing.

This argument is one better addressed to an appellate court. If accepted, it would result in the overruling of *Stencel Aero Engineering Co. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). While defendants may view this as a desirable result, it is not within the power of the district court. The Supreme Court when it decided *Stencel* had defendants' argument before it, *viz.*, that it is illogical, on the one hand, to allow a civilian to sue for his injuries while barring a suit by a serviceman injured by the same negligence, while on the other hand, not allowing a defendant defense contractor sued by the serviceman to implead the United States. *Stencel*, 431 U.S. at 676–77, 97 S.Ct. at 2060 (Marshall, J., dissenting) (noting that "[t]here is no basis" for the dichotomy which results from the Court's holding). The Supreme Court has decided that, at least for the time being, there is a legally significant difference between a civilian suing as plaintiff for injuries not incident to service, and a civilian defense contractor suing as third-party plaintiff.

The third reason given by *Feres* for barring servicemen's claims "incident to service" is that, given the "distinctively federal * * * character" of the relationship between the serviceman and the government, *Feres*, 340 U.S. at 143, 71 S.Ct. at 158, it makes little sense to have the servicemen's recovery depend, as it would under the FTCA, on the fortuity of the state of injury. *Feres*, 340 U.S. at 142–43, 71 S.Ct. at 157–58. While, as pointed out in this court's Preliminary Memorandum on Conflicts of Law, *In re "Agent Orange" Prod-*

*uct Liability Litigation,* P.T.O. No. 92, 580 F.Supp. 690 (E.D.N.Y.1984), the claims of the wives and children implicate important federal interests, the relationship of those plaintiffs with the federal government is not "distinctively federal in character." Furthermore, the court has concluded that on many substantive issues one law will apply to all the claims. *Id.* The fortuity of the place of injury will, therefore, not affect their recovery.

An analysis of the three rationales for *Feres,* thus demonstrates that none of them apply to the independent claims of the wives and children. We are bound by the Supreme Court's decision in *Feres.* But we may not extend the limitation that *Feres* placed on the remedial goals of the FTCA.

## IV. OTHER BARS TO RECOVERY UNDER THE FEDERAL TORT CLAIMS ACT

Because we have concluded that *Feres* does not bar all of defendants' third-party claims, it is necessary to discuss the applicability of other bars to suit in the Federal Tort Claims Act, specifically the exception for claims arising in a foreign country (28 U.S.C. § 2680(k)); the "combatant activities" exception (28 U.S.C. § 2680(j)); and the discretionary function exception (28 U.S.C. § 2680(a)).

### A. *The "Foreign Country" Exception*

28 U.S.C. § 2680(k) provides that the FTCA's waiver of immunity does not apply to "[a]ny claim arising in a foreign country." The purpose of the exception was explained by the Assistant Attorney General who proposed "the [foreign] exemption provision [in] the form which was ultimately enacted into law." *United States v. Spelar,* 338 U.S. 217, 220, 70 S.Ct. 10, 12, 94 L.Ed. 3 (1949): "Since liability is to be determined by the law of the situs of the wrongful act or omission it is wise to restrict the bill to claims arising in this country." Tort Claims: Hearings on H.R. 5373 and H.R. 6463 Before the House Comm. on the Judiciary, 77th Cong., 2d Sess. 35 (January 29, 1942), *quoted in United States v.*

*Spelar,* 338 U.S. at 221, 70 S.Ct. at 12. At the peril of restating the obvious, the purpose of the exception, then, is to ensure that "the United States [is not subject] to liabilities dependent upon the laws of a foreign power." *Id.*

The purpose of the "foreign claim" exception does not apply to this litigation: Not only have none of the parties contended that foreign law should be applied, but there is no theoretical justification for application of foreign law. *Restatement (First) of Conflicts,* § 377 Comment a, does not apply:

> the jurisdiction where most of the use of herbicides took place, South Vietnam, no longer exists and Cambodia appears to be an independent state in name only now taken over by Vietnam. North Vietnam, the jurisdiction that has replaced South Vietnam and Cambodia, was at war with the United States and it was in the prosecution of the war that the exposure to Agent Orange took place.

*In re "Agent Orange" Product Liability Litigation,* P.T.O. No. 92, 580 F.Supp. 690, 707 (E.D.N.Y.1984).

 It is settled that for the bar to apply, "[w]hat must be in a foreign country is * * * not a 'claim arising' but 'an act or omission of an employee of the government.'" *Sami v. United States,* 617 F.2d 755, 762 n. 7 (D.C.Cir.1979). *Accord, Leaf v. United States,* 588 F.2d 733, 735 (9th Cir.1978); *Knudsen v. United States,* 500 F.Supp. 90 (S.D.N.Y.1980); *Bryson v. United States,* 463 F.Supp. 908, 911 (E.D. Pa.1978); *In re Paris Air Crash of March 3, 1974,* 399 F.Supp. 732 (C.D.Cal.1975). Thus, under the FTCA, a tort claim "arises" at the place where the negligent act or omission occurred and not where the injury occurred. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

*Leaf v. United States,* 588 F.2d 733 (9th Cir.1978), is illustrative. The plaintiffs alleged that an undercover agent of the federal Drug Enforcement Administration leased their plane in California for use in a smuggling operation in Mexico and that the

plane was destroyed in Mexico. The plaintiff alleged government negligence in the planning and execution of the operation which occurred in California and Mexico. The circuit court reversed a grant of summary judgment in favor of defendants, granted on the grounds that the "foreign claims" exemption applied.

■ Applying the above analysis to the case at bar, it is undisputed that the initial decision to use Agent Orange, the decision to continue using it, and decisions relating to the specifications for Agent Orange were made in this country. Defendants also contend that the United States was negligent in that it used Agent Orange improperly. It is unclear at this point if the decisions relating to that misuse took place in the United States or Vietnam. It is likely, however, that whatever mistakes were made were of omission as much as commission. There is no reason to attribute those mistakes to Vietnam rather than to the United States and no policy reason to apply the "foreign claim" exception.

### B. Combatant Activities Exception

28 U.S.C. § 2680(j) provides that the FTCA shall not apply to "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." There is no legislative history on this section, see Note, The Federal Tort Claims Act, 56 Yale L.J. 534, 548 (1947), and the caselaw applying the exception is sparse. The caselaw and the commentators all emphasize, however, that the term "combatant activities" should be interpreted very narrowly.

Thus, one commentator understands the phrase to refer only to "operations * * * directly connected with engaging the enemy." Id., 56 Yale L.J. at 549. 1 Jayson, Handling Federal Tort Claims § 262, at 13–107, states that the term implies "actual hostilities and physical violence." Similarly, Skeels v. United States, 72 F.Supp. 372, 374 (W.D.La.1947), states that " 'combat activities' * * * means the actual engaging in the exercise of physical force."

■ Consistent with the well-settled interpretation of the foreign claims exemption, what must arise from the combatant activities is not a "claim" but "an act or omission of an employee of the government." Thus, for example, if a civilian was injured on a battlefield by a grenade that exploded prematurely because the government's specifications for the grenade were improper, that civilian should not be barred by the combatant activities exception from suing. On the other hand, if a soldier was aiming a handgrenade at the enemy and, as a result of his negligence, a civilian was injured, the combatant activities exception would apply.

■ At this stage of the litigation, it appears that the facts are closer to the former hypothetical than the latter. Defendants contend, inter alia, that the government failed, by deliberately omitting a warning label, to properly instruct those who sprayed Agent Orange as to its use and failed to warn servicemen of the dangers of drinking water contaminated with Agent Orange. It may be necessary at some later point to reevaluate the application of the combatant activities exception or even to make that evaluation on a case-by-case basis. At this point, however, the court can certainly not say with a fair degree of certainty that the combatant activities exception applies.

So far as children and wives are concerned, any activity relating to conception and birth were not combatant activities. This defense as to them seems bizarre.

### C. Discretionary Function Exception

■ 28 U.S.C. § 2680(a) provides that the United States does not waive its sovereign immunity for "[a]ny claim based upon an act or omission of an employee of the Government * * * based upon the exercise [of] * * * a discretionary function." The record is not sufficiently developed at this point to enable the court to conclude whether the government's decisions come within the discretionary function exemption. It is not clear who made the relevant decisions or what those decisions were. It would

therefore be improper to grant summary judgment. *Cf. Chicago Heights Venture v. Dynamit Nobel of America, Inc.,* 575 F.Supp. 214 (N.D.Ill.1983) (grant of summary judgment on government contract defense not warranted where there are substantial factual disputes relevant to the application of the defense).

Again, the failure of the government to warn former servicemen and their wives of the hazards of conception when a serviceman had been exposed to Agent Orange presents a special complication. Whatever discretionary function was involved in battlefield decisions, subsequent treatment and non-warning decisions seem to fall within the class of ordinary malpractice long encompassed in the F.T.C.A. *See, e.g., Crumpler v. United States,* 495 F.Supp. 266 (S.D.N.Y.1980); *Schwager v. United States,* 279 F.Supp. 262 (E.D.Pa. 1968).

For the reasons stated, in the forthcoming trial involving a number of claims of miscarriages and fetal deformations, the government will be a third-party defendant. Whether and to what degree the government is liable to wives and children will need to be decided by the court. The court, as it has in the past, will probably request an advisory jury. *See, e.g., Birnbaum v. United States,* 436 F.Supp. 967 (E.D.N.Y. 1977). The jury may well be confused if it is asked for advice on only some of the claims. Accordingly, it may be desirable to avoid confusion and to request an advisory opinion on the third-party claims arising from suits by the servicemen as well as from those being tried at the same time arising from the independent claims of wives and children. This procedure may be particularly useful in view of the question as to the continuing vitality of the *Feres* doctrine in third-party situations and of the effect of post-release malpractice and failure to warn claims. Should it be determined that this court's view of the law on these points is incorrect, a full decision avoiding the need for a retrial is desirable.

It should be emphasized that this memorandum is tentative to assist the parties in preparing for trial. The government may renew its motion to dismiss at any time before or during trial as further evidence and legal developments suggest.

SO ORDERED.