**Bonnie WELLS, Plaintiff and Appellant,**

v.

**Dr. Tom BILLARS, Defendant and Appellee.**

**No. 15085.**

Supreme Court of South Dakota.

Argued April 22, 1986.

Decided July 24, 1986.

Bradley G. Bonynge, Sioux Falls, for plaintiff and appellant.

Carleton R. Hoy, Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant and appellee.

SABERS, Justice.

Appeal from trial court's decision holding plaintiff's medical malpractice action time-barred. We reverse and remand.

*Statement of Facts*

In May of 1982, appellant Bonnie Wells (Bonnie), began to experience problems with her eyes. Specifically, she was unable to see out of her right eye while the left one was closed when applying eye makeup. Shortly thereafter, she made an appointment to be examined by appellee, Dr. Tom Billars (Billars), an optometrist.

Bonnie visited Billars at his Optometric Clinic in Sioux Falls, South Dakota, on May 27, 1982. She reported her symptoms as being cloudiness, blurriness, and seeing squiggly lines in relation to her right eye. Bonnie also told Billars about her experience when applying eye makeup, that her right-sided vision was distorted, and that she couldn't see above a certain area of her right eye.

Billars then conducted an eye examination. He used an opthalmoscope to look through the pupil and into the back of Bonnie's eyes to examine each retina for any deviations or tears. According to Billars' notes, Bonnie's left eye checked-out negative, i.e., no indication of retinal damage. However, due to the fact that the right eye was cloudy, Billars placed a question mark next to the abbreviation "neg" [negative], in reference to the right eye.

The examination report contains the following notes: "If flutter continues dilate, Tschetter, if detach, (will call tomorrow)." Billars explained these notations to mean that if Bonnie's flutter (squiggly lines) continued, then he would want to dilate her pupil and check for a detached retina. If a detachment was indicated, then he would refer Bonnie to Dr. Tschetter, a local opthalmologist, for treatment. Billars further stated that he advised Bonnie to call him if her symptoms continued, or if for any reason she noticed changes. It is undisputed that her symptoms persisted and that Bonnie failed to contact Billars as requested.

Because there were no observable retinal detachments through the opthalmoscope, Billars' initial diagnosis was that of a possible ocular migraine, and he so noted this on the examination report. An ocular migraine is a common and temporary restriction of blood vessels in the retinal area, which is often accompanied by headaches. However, because a flutter can also indicate a detachment, Billars stated that the proper course was to observe and monitor Bonnie, which is why he made the above referenced notes on the examination report.

During this examination, Billars prescribed glasses as the solution to Bonnie's eye problems even though he suspected, among other things, a detached retina. Bonnie's symptom of flutter and the other symptoms she had continued. However, Bonnie thought she should wait and see how the glasses that Dr. Billars prescribed would solve her visual problems before recontacting him as requested. In keeping with regular procedure, Bonnie was scheduled for a progress appointment six weeks after May 27, 1982, for which she was charged $5.00. The follow-up appointment was scheduled for late June or early July.

On the day of the initial examination, Bonnie chose new frames. She returned to the Optometric Clinic (Clinic), on June 18, 1982, to order the glasses and put down a deposit on them. According to the Clinic's records, the glasses were ordered on June 21, 1982. Bonnie again returned to the Clinic's dispensary on June 25, 1982, at which time she was fitted with her new glasses and paid the balance on her bill. Although she did not see Billars personally on these visits, Bonnie was seen by his employees in the dispensary which is run by the Optometric Clinic. The Clinic is a professional corporation of which Billars is a stockholder.

Bonnie testified that she returned to the Clinic for her follow-up appointment and told Billars that she was still unable to see out of her right eye. According to Bonnie's testimony, Billars told her that "it was something that she would have to learn to live with." Billars testified that he never saw Bonnie again after her first and only examination conducted on May 27, 1982. He further stated that had she returned for the follow-up, then progress

notes would have appeared on her examination card in his records. Billars' records do not show a second examination.

Bonnie's symptoms persisted despite the new eyeglasses prescribed by Billars. On September 12, 1983, Bonnie was examined by Sioux Falls Opthalmologist Dr. Thomas White, who detected a detached retina in both her right and left eyes. He recommended immediate surgery. On September 16, 1983, surgery was performed on Bonnie's right detached retina at the Metropolitan Medical Center in Minneapolis, Minnesota. The left detachment was corrected with lazer beam surgery in March, 1984. Bonnie is now legally blind in her right eye.

Bonnie stated that her doctors advised her that had the detachment in her right eye been detected earlier, then her sight may have been preserved. Bonnie contends that Billars' malpractice caused the delay in diagnosis and resultant treatment of her right eye. She commenced this action against Billars on June 15, 1984.

Billars moved to dismiss the action on the basis that the statute of limitations had run. The trial court denied this motion and ordered a trial limited to the issue of the statute of limitations. On June 26, 1985, trial was commenced, and the following question was posed to the jury, "Did Dr. Billars examine or treat Bonnie Wells professionally on or after June 15, 1982?" The jury returned a negative answer and judgment was entered for Billars. The trial court further denied Bonnie's motion for a directed verdict, judgment notwithstanding the verdict, and a new trial.

On appeal, Bonnie argues that the special jury question was too restrictive and that the trial court erred in failing to grant her motions.

DID THE ALLEGED MALPRACTICE, ERROR, MISTAKE OR FAILURE TO CURE OCCUR AFTER JUNE 15, 1982?

If so, this action is not barred by the statute of limitations.

### 1. Special Jury Question

■ Bonnie claims that the special jury question was too limited because it was restricted to the issue of whether Billars professionally "treated" or "examined" her. She contends that the jury could very well have found that Billars "saw" her on the subsequent Clinic visits, even though he did not treat or examine her professionally. However, the record is clear that Bonnie failed to object to the form of the instruction at the time of the special trial, and consequently, is now precluded from raising this issue on appeal. *See: Hogg v. First National Bank of Aberdeen*, 386 N.W.2d 921, 924–925 (S.D.1986). In *Schmidt v. Wildcat Cave, Inc.*, 261 N.W.2d 114 (S.D.1977), we wrote:

> The failure of a court to correctly or fully instruct the jury is not reviewable unless an objection or exception to the instruction identifying the defect therein with sufficient particularity was taken or a written instruction correctly stating the law was requested.

*Id.* at 116, *citing* SDCL 15–6–51; *Lang v. Burns*, 77 S.D. 626, 632, 97 N.W.2d 863,866 (1959) [SDCL 15–6–51(b) clearly makes it the burden of the objecting party to inform the trial judge of the grounds which justify the objection.]; *Englebert v. Ryder*, 77 S.D. 333,339–340, 91 N.W.2d 739,742–743 (1958).

### 2. Continuing Treatment

Bonnie next argues that the trial court erred in refusing to grant her motions for a directed verdict, judgment notwithstanding the verdict or a new trial, and in ruling that both the June 18 and 25, 1982, visits to the Clinic did not amount to "treatment." These arguments present legal questions as opposed to the factual question presented to the special jury.

This action is governed by the statute of limitations found in SDCL 15–2–14.1 which provides:

> An action against a physician, surgeon, dentist, hospital, sanitarium, registered nurse, licensed practical nurse, chiropractor, or other practitioner of the healing arts for malpractice, error, mistake or

failure to cure, whether based upon contract or tort, can be commenced only within two years after the alleged malpractice, error, mistake or failure to cure shall have occurred ...

Bonnie commenced this action on June 15, 1984. Therefore, Billars' malpractice, error, mistake or failure to cure must have occurred after June 15, 1982, in order for this action to be tenable under SDCL 15–2–14.1.

"Optometrists are trained to recognize symptoms of many diseases which may be discovered by eye examination. They are not permitted under recognized optometric standards to undertake a definite diagnosis but recognize this as the responsibility of a medical doctor. Obviously it is foreseeable that failure to refer to a qualified medical practitioner, when required to do so, will result in delay of diagnosis and the institution of treatment[.]" *Steele v. United States*, 463 F.Supp. 321, 333 (D.Alaska 1977). SDCL 36–7–25(11) defines one of the acts of unprofessional conduct relative to the profession of optometry as:

11. The failure to refer a patient to a physician ... if examination of the eye indicates a substantial likelihood of pathology which required the attention of a physician ...

The practice of optometry is defined in SDCL 36–7–1, and includes "the prescribing or employment of lenses, prisms, frames, mountings ... and any other means or method for the correction, remedy or relief of any insufficiencies or abnormal conditions of the visual processes of the human eye ..."

Bonnie contends that the services rendered to her by Billars' employees at the Clinic on June 18 and June 25, 1982, respectively, involved the practice of optometry. She claims that the ordering, purchasing, fitting, and delivery of the glasses Billars prescribed for her constituted "continuing treatment" which occurred after June 15, 1982.

This court recognized the continuing tort theory under the rubric of a malpractice action in *Alberts v. Giebink*, 299 N.W.2d 454 (S.D.1980). We stated:

The alleged misconduct here is defendants' failure to remove the Steinmann pin [from plaintiff's knee] (which assumes it was reasonably necessary to do so), and failing to inform plaintiff of its existence. If proven, this failure would constitute a continuing tort. Generally, when a tort involves a continuing injury, the cause of action accrues and the statute of limitations commences when the wrong terminates. [citations omitted] Some courts hold that the injury continues until the patient leaves the doctor's care.

*Id.* at 456. (*See: Osborne v. County of Los Angeles*, 91 Cal.App.3d 366, 154 Cal. Rptr. 129 (1979); *Wyler v. Tripi*, 25 Ohio St.2d 164, 267 N.E.2d 419 (1971).

Minnesota places a similar two-year limitation period on medical malpractice actions. The cause of action accrues when the physician's treatment for the particular condition ceases. *Johnson v. Winthrop Laboratories Division of Sterling Drug, Inc.*, 291 Minn. 145, 190 N.W.2d 77 (1971); *Schmit v. Esser*, 183 Minn. 354, 236 N.W. 622 (1931). In *Schmit*, the Supreme Court of Minnesota articulated three factors to be considered in determining when treatment ceases: (1) whether there is a relationship between physician and patient with regard to the illness; (2) whether the physician is attending and examining the patient; and (3) whether there is something more to be done. *Id.* 236 N.W. at 625.

Following the reasoning in *Schmit*, the Eighth Circuit Court of Appeals in *Jewson v. Mayo Clinic*, 691 F.2d 405 (8th Cir.1982), stated the following:

When does the treatment cease: So long as the relation of physician and patient continues as to the particular injury or malady which he is employed to cure, and the physician continues to attend and examine the patient in relation thereto, and there is something more to be done by the physician in order to effect a cure, it cannot be said that the treatment has ceased. That does not mean that there must be a formal discharge of the physi-

cian or any formal termination of his employment. If there is nothing more to be done by the physician as to the particular injury or malady which he was employed to treat, or if he ceases to attend the patient therefor, the treatment ordinarily ceases without any formality.

*Id.* at 409.

Billars contends that any alleged act of malpractice, if at all, occurred on May 27, 1982, and is consequently time-barred by SDCL 15-2-14.1. Bonnie claims, however, that Billars prescribed eyeglasses as the solution to her visual problems despite the fact that at the time of her initial examination, his own notes raised a question concerning her right eye. Moreover, Billars stated that the proper course was to observe and monitor Bonnie because a flutter can also indicate a detachment. It follows that her subsequent visits to the Clinic to order and take delivery of the glasses amounted to Billars' continuing treatment[1] relative to the glasses he prescribed. *See: Granahan v. Pearson,* 782 F.2d 30 (4th Cir.1985); *Robinson By Robinson v. Mt.*

*Sinai Medical Center,* 127 Wis.2d 285, 379 N.W.2d 326 (Wis.Ct.App.1985); *Lynch v. Rubacky,* 85 N.J. 65, 424 A.2d 1169 (1981); *Sheldon v. Sisters of Mercy Health Corp.,* 102 Mich.App. 91, 300 N.W.2d 746 (1981); *Farley v. Goode,* 219 Va. 969, 252 S.E.2d 594 (1979); *Re Estate of Davies,* 197 Neb. 320, 248 N.W.2d 344 (1977); *Kraus v. Cleveland Clinic,* 442 F.Supp. 310 (N.D. Ohio 1977); *Piedmont Pharmacy, Inc. v. Patmore,* 144 Ga.App. 160, 240 S.E.2d 888 (1977); *Johnson, supra; Samuelson v. Freeman,* 75 Wash.2d 894, 454 P.2d 406 (1969) (*but see: Bixler v. Bowman,* 94 Wash.2d 146, 614 P.2d 1290 (1980)); *Schmit, supra. See also: Proewig v. Zaino,* 57 A.D.2d 892, 394 N.Y.S.2d 446 (1977); *Kossick v. United States,* 330 F.2d 933 (2d Cir.), *cert denied,* 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964).

We hold that, for the purpose of applying the statute of limitations, Billars duty to cure or attempt to cure continued to the June 18th and June 25th, 1982, visits to the dispensary.[2] We further hold that

---

1. According to Louisell & Williams, *Medical Malpractice,* Vol. 1, § 13.08 (1981), in states (such as South Dakota) having statutes providing for the accrual of a malpractice action on the date of the wrongful act of the health care provider, the "continuous treatment rule" is followed. Louisell & Williams explain the rule as follows:

   The ... 'continuous treatment rule' has been defended on the grounds of fairness as well as on the basis of logic. Certainly it would not be equitable to bar a plaintiff who, for example, has been subjected to a series of radiation treatments in which the radiologist negligently and repeatedly administered an overdosage, simply because the plaintiff is unable to identify the one treatment that produced his injury. Indeed, in such a situation no single treatment did cause the harm; rather it was the result of several treatments, a cumulative effect. From the point of view of the physician it would seem reasonable that when he has made a mistake, a misdiagnosis, for example, he is entitled to the opportunity to correct the error before harm ensues. And, as one court has put it, 'It would be absurd to require a wronged patient to interrupt corrective efforts by serving a summons on the physician'.

   The rule as generally formulated is that if the treatment by a doctor is a continuing course and the patient's illness, injury or condition is

of such a nature as to impose on the doctor a duty of continuing treatment and care, the statute does not commence running until treatment by the doctor for the particular disease or condition involved has terminated unless during treatment the patient learns or should learn of negligence, in which event the statute runs from the time of discovery, actual or constructive. Since about 1940 there has been a slow but steady trend toward judicial acceptance of the continuing treatment rule ...[.]

2. For the purpose of determining the statute of limitations, Billars' duty to cure or attempt to cure appears to have continued in this case up to the date of the scheduled but missed, followup appointment. The fact of the missed appointment may be evidence of negligence on Bonnie's part which may pertain to the question of liability, but not to the statute of limitation question presented here. *See also: Thomas v. Golden,* 51 Mich.App. 253, 214 N.W.2d 907 (1974) [Medical malpractice action in jurisdiction which recognizes "continuous treatment"; granting of appointment by optometrist because of patient's pain following contact lens fitting *held* to have initiated running of limitations statute, even though optometrist did not keep appointment and rendered no further treatment or services. The abortive appointment superseded the lens fitting as the "last treatment or service."]

for the purpose of determining the statute of limitation question, it is immaterial whether or not the individuals fitting and ordering the glasses were Billars' employees, servants or agents because their acts were part of his "cure or attempt to cure." Until the glasses were delivered and fitted, Bonnie was still under his continuing treatment.

Billars argues that the continuing treatment rule does not apply to the acts of his employees and urges *Holmes v. Iwasa*, 104 Idaho 179, 657 P.2d 476 (Idaho 1983) in support. In *Holmes*, a doctor's affidavit provided in part that treatment of a patient commences with the first examination and continues on as long as the problem of the patient is not corrected by the first procedure of the physician or health care provider. "Eyeglasses themselves are ... a facet of the treatment." *Id.* 657 P.2d at 480. The court acknowledged the claim that the course of treatment continues throughout the series of appointments, and stated:

> ... The question, however, is not one of continuing treatment, because [the Idaho statute [3]] as amended, expressly states that any continuing professional relationship between the injured party and the alleged wrongdoer shall not extend the limitation period.

*Id.*

The Idaho statute expressly rejects the continuing treatment rule. SDCL 15–2–14.1 does not reject the continuing treatment rule, in fact, the statutory language "failure to cure" implies acceptance.

What is the alleged malpractice, error, mistake or failure to cure that occurred after June 15, 1982? It is not commission, but omission. At a minimum, it is the alleged failure to observe and monitor on June 18, 1982, and June 25, 1982, or thereafter. Furthermore, although the specific

alleged events of improper eye examination, failure to refer, and prescribing eyeglasses while suspecting a detached retina occurred before June 15, 1982, Billars alleged malpractice, mistake, error or failure to cure may also arise from the failure to do any one of them after June 15, 1982, while Bonnie was still under his care.

Therefore, we reverse and remand for trial.

FOSHEIM, C.J., and HENDERSON and WUEST, JJ., concur.

MORGAN, J., dissents.

MORGAN, Justice.

I dissent.

The majority's reliance on *Alberts v. Giebink*, 299 N.W.2d 454 (S.D.1980), is entirely misplaced. *Alberts* was a foreign object case, as it so noted: "Medical malpractice case law is replete with exceptions to statutes of limitations where foreign bodies are left in surgical patients." *Id.* at 455. The *Alberts* case dealt with failure to remove a pin from Alberts' left knee. Our decision extended the foreign object exception formerly applied only to clamps and sponges accidentally and negligently left in a patient, to include foreign bodies intentionally inserted. As noted in the majority opinion: "'Generally, when a tort involves a continuing injury, the cause of action accrues and the statute of limitations commences when the wrong terminates.'" (Quoting *Alberts*, 299 N.W.2d at 456.) But what application does that theory have in this case? If he was guilty of anything, Billars was guilty of failure to refer Bonnie to an ophthalmologist. He certainly didn't leave anything planted in her eye. The majority seeks to apply this theory of recovery to a continuing treatment situation. On her return to fit the glasses and pay for them

---

**3.** Idaho Code § 5–219 (1971) provides in part:
Actions ... for professional malpractice ... Within two (2) years:

\*     \*     \*     \*     \*     \*

(4) ... but in all other actions, whether arising from professional malpractice or otherwise, the cause of action shall be deemed to have accrued as of the time of the occurrence, act or omission complained of, and the limitation period shall not be extended by reason of any continuing consequences or damages resulting therefrom or any continuing professional or commercial relationship between the injured party and the alleged wrongdoer, ...

there was apparently some negligence for failure to act on the part of Billars, who didn't even see her. This extends the exceptions to the statute of limitations farther than this court has ever gone before. I would reject that application.

In *Alberts*, we also made passing mention of the Ohio case of *Wyler v. Tripi*, 25 Ohio St.2d 164, 267 N.E.2d 419 (1971). The Ohio exception to the statute of limitations was stated in *Wyler* as follows: "[I]n all medical malpractice cases, the latest time at which the statute of limitations commences running is the time at which the physician-patient relationship finally terminates." 25 Ohio St.2d at 168, 267 N.E.2d at 421. The *Alberts* decision is not totally clear as to which theory it was decided on. "The record before the court on the motion to dismiss shows no final act or occurrence sufficient to commence the running of any statute of limitations." *Alberts*, 299 N.W.2d at 456. But in any event, it was clearly a decision based on the presence of a foreign object and a failure to adequately diagnose and refer.

Similarly, the majority opinion here does not spell out which theory this decision is based on. We are talking about an exception to the statute of limitations. Certainly an exception should be defined and delineated as to its application. I see this decision as a wholesale repeal of the statute of limitations and accordingly I dissent.