Beverly **NIZIELSKI** and Loretta **McClain, Plaintiffs and Appellants,**

v.

Ervin **TVINNEREIM** and Selma **Tvinnereim, Defendants and Appellees.**

No. 15864.

Supreme Court of South Dakota.

Considered on Briefs Feb. 19, 1988.

Decided Sept. 28, 1988.

Arthur M. Hopper of Austin, Hinderaker, Hackett & Hopper, Watertown, for plaintiffs and appellants.

Rory King of Siegel, Barnett & Schutz, Aberdeen, for defendants and appellees; James R. Delaney of Delaney, Vander Linden & Delaney, Webster, on the brief.

MORGAN, Justice.

Appellants Beverly Nizielski and Loretta McClain (appellants), appeal from a summary judgment entered by the trial court against the appellants on their action for an accounting of the estate of their mother Lena Tvinnereim (Lena). The accounting was sought from two of Lena's other children, Ervin Tvinnereim (Ervin) and Selma Tvinnereim (Selma). We reverse.

The background for this contest finds the parties are four of thirteen children who survived their parents Ben and Lena Tvinnereim. Ben died testate in 1947. The will admitted to probate gave, among other specific devises, two quarters of land (the

home place) to brothers Donald and Ervin, subject to a life estate in Lena. The residue of the estate was divided equally among Lena and the children. Ervin subsequently bought out Donald and it is undisputed that he took title to the home place on the passing of Lena in 1984 at age ninety-seven. Lena had remained in the family home on the farm until six months before her death. Ervin and his family lived in a separate home on the farm where he had resided since 1949.

In 1967, Lena began to experience difficulties with her vision, which continued to deteriorate. In 1968, Lena suffered a broken hip as the result of a fall and thereafter was unable to walk without the aid of a walker. At that point, Selma came to live with her mother and care for her needs. By 1971, Lena's vision was below the "legal blindness" level. During Lena's later years her hearing was also impaired.

From 1947 to 1957, the farm land was leased by Ervin and three of his brothers. It was at the end of that period that Ervin bought out Donald and terminated the partnership with the other brothers. The rental arrangements for the period from 1958 through 1975 are not clear. Ervin claims that part of the time it was a share-crop arrangement and the balance was a cash-rental basis, but Ervin is unable to find his own records to substantiate this, nor can Lena's meticulously detailed ledger book be found. Each side of the litigation blames the other for its disappearance. In 1962 or 1963, when Ervin built his home on the farm, Lena cooperated in signing a new mortgage that raised the mortgage indebtedness on the home place from $12,000 to $18,000 and extended the payments from 1967 to 1975.

Ervin claims that in 1975 Lena wanted to be relieved of the responsibility for payment of taxes and upkeep on the property and suggested that Ervin "take charge." In exchange for the security of living at the homestead for the rest of her life, she relinquished all of the farm income to Ervin. As evidence of this agreement, Ervin points to a quitclaim deed executed by Lena on April 4, 1975, conveying the property to Ervin and his wife, reserving, however, a life estate interest to Lena, "she to have the income therefrom and to pay all taxes." Ervin testified that the life estate reservation was only to protect Lena in the event that he predeceased her. Evidence in the record reflects that Lena signed checks for expenses and hospital bills up until six months prior to her death.

In 1962, a joint tenancy checking account was created by Lena and Ervin. Ervin testified that from 1975 on, with but few exceptions, the only income deposited in that account was Lena's social security benefits. In any event, after the other children began demanding an accounting, Ervin made a distribution of the balance in that account in the total sum of $9,000 plus.

This action was commenced when Ervin refused to make any accounting to the others for Lena's rental income for the many years that Ervin had farmed the land. After considerable discovery, Ervin and Selma made an alternative motion to dismiss the action for failure to state a cause of action or for summary judgment. They supported their motion with a statement of some thirty-four "undisputed facts." These "facts" were allegedly supported by the affidavits, depositions, and admissions on file. Appellants responded with objections to the statement, also allegedly supported by the affidavits, depositions, and admissions in the record. In the memorandum decision supporting the granting of the motion for summary judgment, the trial court stated:

> The Plaintiff has a duty to bring before the Court the facts upon which they base their claim. This the Plaintiffs failed to do. Plaintiffs seek a fishing expedition at trial to find the facts necessary to back up their claims. This will not be allowed.

We cannot agree with the trial court's disposition of the case. It appears to us that there are substantial issues of material facts that require resolution by a trial. *Wilson v. Great Northern Railway Co.*, 83 S.D. 207, 157 N.W.2d 19 (1968), is the proemial writing on the use of summary

judgment in this court. It has been cited repeatedly by this court. Among the lessons it teaches us are:

'The question presented by [motion for summary judgment] is whether or not there is a genuine issue of fact. It does not contemplate that the court shall decide such issue of fact, but shall determine only whether one exists.' ...

... Three classes of litigation which are not usually suited for summary disposition are (1) negligence actions, (2) actions involving state of mind, (3) equitable actions.

83 S.D. at 211–12, 157 N.W.2d at 21–22.

On appeal, the scope of review from a granting of a summary judgment motion as set out in *Time Out, Inc. v. Karras*, 392 N.W.2d 434, 436–37 (S.D.1986), is as follows:

[O]ur scope of review on appeal is not under the 'clearly erroneous' doctrine, but rather under the strict standards attendant upon entry of summary judgment as delineated in *Wilson, supra:*

(1) Evidence must be viewed most favorable to the nonmoving party;

(2) The burden of proof is on the movant to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law;

(3) Summary judgment is not a substitute for a court trial or for trial by jury where any genuine issue of material fact exists;

(4) Surmise that a party will not prevail upon trial is not sufficient basis to grant summary judgment on issues which are not shown to be sham, frivolous or so unsubstantial that it is obvious that it would be futile to try them;

(5) Summary judgment is an extreme remedy which should be awarded only when the truth is clear and reasonable doubts touching the existence of a genuine issue as to material fact should be resolved against the movant;

(6) When no genuine issue of fact exists, summary judgment is looked upon with favor and is particularly adapta-

ble to expose sham claims and defenses.

From our review of the record, we are of the opinion that there are material issues of fact properly raised by appellants. The question of Lena's intent, whether to turn the entire property over to Ervin and Selma or to distribute it equally among the children, is a key issue of material fact. We perceive this to be clearly raised by the affidavit of Donald where he claims that Lena rejected the need for a will because "all her property would be equally distributed among her children as directed and required by the will of her late husband." While there is evidence that Lena was a strong-willed person, it is also quite evident that from the time of her disabling fall and her failing eyesight and hearing, she was very much dependant upon Ervin and Selma for her day-to-day care. This appears to raise a confidential relationship which, of course, changes the burden of proof in this litigation. *Delany v. Delany*, 402 N.W.2d 701 (S.D.1987). The foregoing, coupled with the admonition that summary judgment is not usually suitable for actions involving state of mind and equitable actions, leads us to the decision that the trial court erred in granting summary judgment in this instance.

Accordingly, we reverse the summary judgment.

WUEST, C.J., and SABERS and MILLER, JJ., concur.

HENDERSON, J., concurs specially.

HENDERSON, Justice (concurring specially).

Here, Beverly Nizielski and Loretta McClain were denied, *inter alia*, the opportunity to present evidence to a jury that joint tenancy accounts were established for convenience. The complaint sounded in (1) failure to account in a fiduciary capacity and (2) wrongfully inducing an agreement so as to gain control of all farm income. Deceit and *undue influence* is alleged on

the latter count.[1] All parties hereto are sisters and a brother.

During Lena's lifetime,[2] Ervin and Lena wrote checks on the joint account. Ervin signed checks at/about the time Lena suffered a stroke to pay Lena's attendant medical expenses. This suggests a joint account for convenience. Lena apparently represented that she wanted *all* of her children to share equally. During Lena's lifetime (died at 97), she vouchsafed that her children be treated fairly and alike. Fact questions exist in this case; a jury should assess the credibility of the witnesses.

Ervin geographically lived very close to Lena. Apparently, Lena leaned upon Ervin and Selma for assistance, which Ervin and Selma rendered—in business and personal affairs. Ervin and Selma occupied a close relationship with Lena, in fact. Unequal footing and one party in a position of dominance? *Davies v. Toms*, 75 S.D. 273, 281, 63 N.W.2d 406, 410 (1954). This is a confidential relationship question. It is a question of fact, not of law.

Ervin and Selma were the movants; Beverly and Loretta, as non-movants, were entitled to have the evidence reviewed in a light most favorable to them. The trial court appears to have done the opposite. Having established a prima facie case of confidential relationship, Beverly and Loretta are now entitled to have Ervin and Selma proceed with evidence. The burden of proof shifted, *Delany v. Delany*, 402 N.W.2d 701, 705 (S.D.1987). A confidential relationship creates a rebuttable presumption of *undue influence*.[3] *Black v. Gardner*, 320 N.W.2d 153, 157 (S.D.1982). Too many legal and factual factors weighed against a summary judgment in this case; therefore, it should not have been granted. I would reverse. Furthermore, aside from the confidential relationship issue, although the burden of proof was upon appellees to establish via-

bility for the grant of a summary judgment, the trial court imposed the burden of proof (*expressly*) upon appellants.

A determination, as a matter of law, was made by the trial court that Lena's checking and savings accounts belonged solely to the surviving tenant, Ervin. Given Lena's age and her dependence on Ervin and Selma, plus the statement of Ervin himself ("... I took over"), an inference may arise of improper conduct. *In re Estate of Borsch*, 353 N.W.2d 346, 349 (S.D.1984). See also duties imposed under SDCL 55-1-8:

> One who gains a thing by fraud, accident, mistake, *undue influence,* the violation of a trust or other wrongful act, is, unless he has some other and better right thereto, an implied trustee of the thing gained for the benefit of the person who would otherwise have had it. (Emphasis added.)

Ervin himself maintains that he and his mother, Lena, made a contract whereby he would supervise all of her financial affairs. Thus, he would be entitled to *all* of the income from the farm, he claims, as part of the contract. Purportedly, this contract was agreed to in 1975. It was, he maintains, supported by Lena's execution of a Quit Claim Deed. However, at the time of the execution of said deed, Lena was legally blind; her hearing was impaired; she had broken her hip sixteen years before her death. She was unable to walk without a walker for the balance of her life. A deposition reveals that she could not take care of herself during any of the remaining sixteen years of her life.

A deposition further reveals that Selma lived with Lena. Lena depended upon Selma for her daily needs. Ervin lived very close by. Lena depended upon Ervin for transportation and other needs. Ervin or Selma would write checks for Lena's needs and would tell her where to write her

---

1. The prayer for relief requests an accounting "for all monies and property owned or possessed by Lena Tvinnereim, or to which she was entitled, at the time of her death[.]"

2. No one could locate a Last Will and Testament of Lena's; her estate is intestate.

3. Ervin told Donald Tvinnereim shortly after the funeral, the financial affairs would only go back two years because that was "more or less when I took over."

name. A combination of the infirmity of a parent, his reliance upon the advice of his children, and the trust placed in them establishes a confidential relationship. *Hedges v. Hedges*, 87 S.D. 425, 430, 209 N.W.2d 660, 663 (1973); *Jaeger v. Sechser*, 65 S.D. 38, 270 N.W. 531 (1936). Thus, the trial court could not have shrugged this relationship off. It went to the heart of this lawsuit. To hold, as the trial court did, that these accounts, as a matter of law, belong exclusively to Ervin, are certainly, at best, open to surveillance and legal determination.

A reading further discloses questions of fact concerning the history of certificates of deposit which were in the names of Lena or Ervin. Ervin, when questioned about Lena's accounts and holdings, failed to mention these certificates of deposit; Selma, also, denied any knowledge of these accounts. But they did exist. Is this not, then, a classic question of factual dispute? An accounting of these certificates of deposit should be made.

Finally, I am sorely troubled by the manner in which Ervin supervised his mother's farm. Lena possessed a life estate in the farm. She executed a Quit Claim Deed to this 320–acre farm (reserving a life estate!)[4] with the covenant "she to have the income therefrom and pay all taxes." Even Ervin admitted that his mother never received a dime in income from the farm— though it was directed in the Quit Claim Deed. It stated: "[S]he to have the income therefrom. . . ."

4. She already had one.

At a trial, all of these matters should be explored. Existence of a confidential relationship requires close judicial scrutiny of the transaction. *In re Metz' Estate*, 78 S.D. 212, 222, 100 N.W.2d 393, 398 (1960). Let us, therefore, reverse, that close scrutiny may proceed. Granting a summary judgment was too extreme under the circumstances of this case.

Reference is made to SDCL 15–6–15(a), Amendments to pleadings. The trial judge called this case, on the record, a "fishing expedition." The trial court reflected that plaintiffs were trying to "find the facts necessary to back up their claims." As lawyers, we must conceptually theorize our cause of action, prepare our pleadings, and then proceed with facts to establish the causes of action pleaded. There is no explicit reference to violation of an implied trust in the pleadings. I note appellant's counsel briefs this particular theory: "Accounting from Ervin and Selma is based upon the imposition of an implied trust upon all property wrongfully obtained by Ervin." 76 Am.Jur.2d *Trusts* § 505, at 726 (1975), is also cited. Omega thought: Wherefore dost the trust arise, pleadingwise?