KURYLAS, INC., Plaintiff–Appellant,

v.

Walter J. BRADSKY,
Defendant–Appellee.

No. 16594.

Supreme Court of South Dakota.

Argued Oct. 17, 1989.

Decided Feb. 21, 1990.

Rehearing Denied April 2, 1990.

J.M. Grossenburg, Day & Grossenburg, Winner, Gale Fisher of Fisher & Hughes, Sioux Falls, for plaintiff-appellant.

Paul T. Barnett of Siegel, Barnett & Schutz, Aberdeen, for defendant-appellee.

DOBBERPUHL, Circuit Judge.

Kurylas, Inc. (Kurylas) appeals from a summary judgment entered against it in its action for damages allegedly arising from an attorney/client relationship with Walter J. Bradsky (Bradsky). We affirm.

Kurylas' complaint in this case alleged damage from a conversion suit brought against it by Rushmore State Bank. *See Rushmore State Bank v. Kurylas, Inc.,* 424 N.W.2d 649 (S.D.1988). A $83,711.58 judgment was entered against Kurylas and in favor of Rushmore State Bank. Kurylas also incurred a large amount of attorney's fees due to the conversion suit and other matters. Kurylas alleged that Bradsky negligently failed to possess and exercise that degree of knowledge and skill ordinarily possessed and exercised by lawyers engaged in the legal profession in the same or similar locality.

Kurylas and Bradsky agree that an attorney/client relationship existed between them. Roman Kurylas, president and primary owner of Kurylas, is married to Bradsky's sister Wilma. Due to this relationship, Bradsky worked with Kurylas on many matters. The relationship pertinent to this appeal is one which grew out of transactions involving the sale of a motel complex.

Kurylas owned a motel which was being offered for sale to Darrell Kiser (Kiser). Kurylas negotiated the sale with Kiser. Kurylas asked Bradsky to draw up documents relevant to the sale of the motel. The document relevant to this appeal contained a clause in which Kurylas was granted a security interest in the personal property of the motel. In addition, a financing statement was to be filed at the time of the execution of the sale agreement. The financing statement was not filed until over a year later. A chronological sequence of events follows setting out the dates and transactions or events that occurred:

June 11, 1983: Kurylas transfers an interest in realty, inventory, equipment and liquor licenses in a motel to Kiser by an exchange agreement and contract for deed. A part of this agreement provided Kurylas with a security interest in the personal property. Bradsky acted as the attorney for Kurylas and prepared the above-named documents.

June 23, 1983: Rapid City Motel Company (Motel Company) is incorporated.

July 1, 1983: Kiser transfers his interest in the real property of the motel into the newly formed corporation. Sometime later, Kiser, doing business as Motel Corporation, failed to make payment as contemplated in the June 11, 1983, agreement.

November 1983 to January 1984 inclusive: Bradsky becomes concerned about the time the corporation's problems consume and relates this to Kurylas. At that point, Bradsky escorts his sister and brother-in-law to the Rapid City law firm of Costello, Porter, Hill, Heisterkamp & Bushnell (Costello, Porter).

February 4, 1984: Kiser and Motel Company execute an exchange agreement and contract for deed transferring their interest in the motel complex to Neil P. Lewis (Lewis) and others as trustees for Ceasar's, a corporation to be formed.

February 9, 1984: Kurylas, Kiser and Motel Company execute a consent to transfer of the property to Ceasar's.

October or November 1984: Kurylas, disappointed with representation of the Costello, Porter firm, contacts attorney Joseph Butler (Butler) of Bangs, McCullen, Butler, Foye & Simmons to assume the corporation's representation.

November 7, 1984: Butler, realizing that no financing statement has been filed concerning the June 11, 1983, transaction, contacts Bradsky who subsequently mails the financing statement naming Kiser as debtor to the Secretary of State and Pennington County Register of Deeds.

December 11, 1984: Ceasar's executes a security agreement in favor of Rushmore State Bank (Bank) in all inventory, accounts, equipment and general intangibles.

December 13, 1984: Bank files a financing statement identifying Ceasar's as its debtor.

April 15, 1985: Kurylas files a financing statement identifying Lewis as debtor.

October 30, 1987: Pennington County Sheriff's Office receives the complaint for this action for service upon Bradsky.

November 9, 1987: Summons and complaint are served upon Bradsky.

The trial court considered these facts in making its determination. Applying the statute of limitations found in SDCL 15–2–14.2 the trial court entered summary judgment in favor of Bradsky. Further, the trial court announced that the continuous representation doctrine did not apply in this case to toll the statute of limitations.

Kurylas raises two issues:

1. Whether the trial court erred in applying the statute of limitations.

2. Whether the trial court erred in its application of the "continuous representation" doctrine.

The scope of review from an order granting summary judgment is:

[O]ur scope of review on appeal is not under the 'clearly erroneous' doctrine, but rather under the strict standards attendant upon entry of summary judgment as delineated in *Wilson* [*v. Great Northern Railway Co.*, 83 S.D. 207, 157 N.W.2d 19 (1968)]:

(1) Evidence must be viewed most favorable to the nonmoving party;

(2) The burden of proof is on the movant to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law:

(3) Summary judgment is not a substitute for a court trial or for trial by jury where any genuine issue of material fact exists;

(4) Surmise that a party will not prevail upon trial is not sufficient basis to grant summary judgment on issues which are not shown to be sham, frivolous or so unsubstantial that it is obvious that it would be futile to try them;

(5) Summary judgment is an extreme remedy which should be awarded only when the truth is clear and reasonable doubts touching the existence of a genuine issue as to material fact should be resolved against the movant;

(6) When no genuine issue of fact exists, summary judgment is looked upon with favor and is particularly adaptable to expose sham claims and defenses.

*Lunstra v. Century 21 GKR–Lammers*, 442 N.W.2d 448 (S.D.1989); *Nizielski v. Tvinnereim*, 429 N.W.2d 483, 485 (S.D. 1988), *quoting Time Out, Inc. v. Karras*, 392 N.W.2d 434, 436–37 (S.D.1986). From our review of the record, there are no material issues of fact. The issues raised are questions of law.

■ Kurylas states in a third issue that summary judgment should not have been granted. This claim is actually incorporated in the other two issues. However, a brief note on summary judgment is warranted. Kurylas claims that a summary judgment is not proper for a statute of limitations question *citing Schoenrock v. Tappe*, 419 N.W.2d 197 (S.D.1988), for the proposition that statute of limitation questions are normally for the jury. Kurylas fails to recognize that the *Schoenrock* court allowed dismissal of the action on the statute of limitations issue. If the facts were in dispute, then there would be a material issue of fact invalidating the summary judgment. In the case at bar the facts are not in issue, only the application of law. This is the same scenario recognized in *Schoenrock.*

### THE OCCURRENCE RULE

■ SDCL 15–2–14.2 reads:

An action against a licensed attorney, his agent or employee, for malpractice, error, mistake or omission, whether based upon contract or tort, can be commenced only *within three years after the alleged*

*malpractice, error, mistake or omission* shall have occurred. This section shall be prospective in application. (emphasis added).

Kurylas' claim is very similar to the claims made in the *Schoenrock* case, *supra*.[1] In *Schoenrock* the client commenced an action against his attorney for rendering an inaccurate title opinion. The attorney rendered a title opinion on February 20, 1981. The title opinion failed to mention a certain wildlife easement which contained various restrictions on the land. This court found:

> Under the "occurrence rule" as expressed by our statute, a cause of action for negligently examining a title accrues at the time the attorney provides the client with the erroneous information, in effect, when the omission occurs.

*Schoenrock, supra,* at 199. The action was barred after February 20, 1984. Hence, summary judgment was appropriate because Schoenrock's attorney did not sign the summons and complaint until November 25, 1985.[2]

Here, as in *Schoenrock*, Kurylas urges the court to follow a date of damage or injury rule to determine when the statute begins to run for attorney malpractice actions. This type of theory is also referred to as the discovery rule. South Dakota has chosen not to follow the discovery or date of damage rule. The legislature has specifically set up an "occurrence" rule. This court has previously stated:

> The general rule is that in the absence of an attorney's fraudulent concealment of his negligent advice, the statute of limitations on a claim of attorney malpractice begins to run at the time of the alleged negligence and *not from the time when the negligence is discovered or the consequential damages are imposed.* (emphasis added).

**1.** In the *Schoenrock* case, the claim was that "the statute of limitations did not begin to run until he sustained some injury, which he claims did not occur until he finally reconverted his land to its original condition." *Schoenrock, supra,* at 199.

**2.** *Schoenrock* also tried to apply the continuous representation doctrine to toll the statute of

*Schoenrock, supra,* at 199; *Hoffman v. Johnson,* 374 N.W.2d 117 (S.D.1985).

The injury is the late filing of the financing statements. The motel property in question changed hands from Kurylas to Kiser, then to Kiser's corporation. After Kiser's corporation defaulted, the motel was transferred to Ceasar's, another corporation. The exchange agreements between all these parties contemplated the filing of financing statements.

Kurylas did have a financing statement filed listing Kiser as a debtor on November 13, 1984. However, Kiser no longer had any interest in the property after July 1, 1983. *See Rushmore State Bank v. Kurylas, Inc., supra.* Therefore, this filing was ineffective against Ceasar's, the current party in default. In the meantime, the Rushmore State Bank had filed a financing statement listing Ceasar's as the debtor. Subsequently, Kurylas filed a financing statement with Lewis, Ceasar's trustee, listed as a debtor.

The negligence[3] is the failure to file a timely financing statement and list the proper debtor. The question becomes what *act or omission* starts the time clock running under these facts for statute of limitation purposes. South Dakota case law is very limited regarding SDCL 15–2–14.2.

The first case interpreting this statute was *Hoffman v. Johnson, supra.* Although this case applied another statute of limitations, it effectively introduced the occurrence rule. *Hoffman* reviewed the legislative history of SDCL 15–2–14.1 and 15–2–14.2. It noted that the previous discovery rule adopted by SDCL 15–2–15(3) was rejected. *See also, Alberts v. Giebink,* 299 N.W.2d 454 (S.D.1980) (SDCL 15–2–14.1 is reviewed concerning medical malpractice limitations).

The next case reviewing this statute was *Glad v. Gunderson, Farrar, Aldrich,* 378

limitations. This is discussed later in this opinion.

**3.** On a summary judgment case, we must assume negligence because the facts are always viewed most favorably towards the nonmoving party.

N.W.2d 680 (S.D.1985). Summary judgment was ordered by application of the statute of limitations in SDCL 15–2–14.2. It was conceded that time had run under this statute. The defense, fraudulent concealment of the legal malpractice action, tolled the statute of limitations however. The facts were found insufficient to constitute fraudulent concealment. Thus, the *Glad* case does not give much guidance for this situation.

The next decision, *Schoenrock, supra,* is important because it notes that the act or omission begins the running whether the act could have been later cured or not. Of course, if an attorney is under a duty to correct the act because he or she is continuing to represent the client on the same matter then the statute of limitations is tolled.

There are several times where Bradsky may have acted in a negligent fashion, either by commission or omission. The first omission occurred upon the initial transfer from Kurylas to Kiser on June 11, 1983, where an effective financing statement was never filed.[4] A second omission could be presumed to have occurred when Kiser transferred the motel to his corporation. This was on July 1, 1983. Another transfer occurred in February of 1984 where no financing statement was immediately filed. A financing statement was filed more than a year later.

In any event, the date which begins the running of time is the date of each transfer where Bradsky allegedly represented Kurylas. If the latest transfer date is used, then the last possible date when an action could have been initiated was February 9, 1987. The current action was started at least eight months after that date. Therefore, the occurrence rule precludes Kurylas' action.

## THE CONTINUOUS REPRESENTATION DOCTRINE

 Kurylas raises the continuous representation doctrine as a defense to the

statute of limitations. The continuous representation doctrine was first recognized in the area of medical malpractice. The continuing treatment rule in the medical malpractice area was accepted in *Alberts v. Giebink, supra,* and more fully developed in *Wells v. Billars,* 391 N.W.2d 668 (S.D. 1986). *Schoenrock, supra,* was the case which adopted the medical continuing treatment doctrine and extended it to legal malpractice actions.

A continuous representation is, in effect, when there is a:

> "[C]lear indicia of an *ongoing, continuous, developing, and dependent relationship* between the client and the attorney...." This relationship is one "which is *not sporadic but developing and involves a continuity of the professional services from which the alleged malpractice stems."* Furthermore, the application of this doctrine should only be applied where the "professional's involvement after the alleged malpractice is for the *performance of the same or related services and is not merely continuity of a general professional relationship."* (citations omitted). (emphasis added).

*Schoenrock, supra,* at 201. *See generally, Wells v. Billars, supra.* This presents another question where the facts are not in dispute, only the application of the law.

Kurylas claims that Bradsky continuously represented it through November 7, 1987. Kurylas presented records from Costello, Porter showing many telephone conferences and meetings with Bradsky relating to Kurylas' representation. The Costello, Porter billings show contact between Bradsky and Costello, Porter from the time that Kurylas came to that firm until the time when Kurylas contacted Attorney Butler. The relevancy of this evidence is questionable, since it does not prove that Kurylas (client) and Bradsky (attorney) had a continuing relationship on

---

**4.** This court noted that the transfer cut off any interest Kurylas may have had. *Rushmore*

*State Bank, supra.*

this matter. Undoubtedly, Costello, Porter did continue to contact Bradsky; however, the contacts do not establish a continuing relationship on this specific matter between Kurylas and Bradsky. This does not present "clear indicia of an ongoing, continuous, developing, and dependent relationship between the client and attorney." *Schoenrock, supra,* at 201. Further, this evidence does not show any relationship between the professional services and the alleged omission(s).

The deposition testimony is most relevant to disposition of this issue. Many statements are not disputed. First, Kurylas' attorney, Butler, answers questions asked by Bradsky's attorney:

Q Joe, maybe in looking at your billing statements it may help you. When did you first get involved in representation of Kurylas in their interests in the property of the motel?

A Well, it sticks in my mind that sometime in November Wilma—or maybe Wilma and Doc came in to see me and explained to me about the problem they were having with regard to the motel; that Kaiser [sic] was in reorganization and they weren't getting their payments and that the firm of Costello–Porter had been representing them for a rather long period of time, and that they weren't getting any results.

. . . .

Q When you got into the lawsuit, Joe, from whom did you get the files for, you know, pertaining to Kurylases' interest in that property?

A Costello–Porter.

. . . .

Q And did you—when you say Costello–Porter, you're talking about that firm in town.

A Yes.

Q And particularly Bill Porter and Jack Costello?

A I think Jack was doing most of the work on the file, so I think I contacted Jack.

Q And did you discuss the case and the status of the case and where it was

going and the likelihood of what was going to happen with Jack Costello?

A Well, I think it had been agreed by the Kurylases that they were going to let Costello–Porter go and have us undertake their representation at that point in time.

Q And you viewed the Costello–Porter firm as representing Kurylases' interests in the property of the motel?

A They were handling the matter so far as I knew.

Q It's where you sought the information regarding that interest; you got the files from them?

A I don't know how much I visited with them. I could pretty much tell from talking with Wilma and Doc where it was at, and then we did get—as I remember we did get quite a few files, a file shelf full.

. . . .

Q Let's go to the filing of the financing statement, which reflects Kaiser [sic] as a debtor by Mr. Bradsky on November 13, '84, is when it gets to the Secretary of State's office. Is it your position that you raised the issue as to the status of the financing statement should be looked into; is that fair?

A Yes.

Q You made the legal decision to look into that?

A Yes.

Q And somehow you put into action the ministerial act of having it filed; is that fair?

A I think that's correct, although Wilma might have a better recollection of that meeting than I do.

Q And you agree with me that is a ministerial act of sending the document to the Register of Deeds and Secretary of State's office?

A Yeah.

These statements show an unbiased appraisal of who was controlling Kurylas' legal interests.

There is more deposition testimony which is especially important. Mrs. Wilma Kurylas is the secretary-treasurer of Kurylas, Inc., wife of the president of Kurylas, Inc.,

and Bradsky's sister. It is not disputed that Bradsky took Mr. and Mrs. Kurylas to Costello, Porter. The *claimed* dispute is that Bradsky was still the attorney responsible for handling the motel transaction. However, the deposition of Mrs. Kurylas portrays a different picture.

Q And did Mr. Porter agree to take over the proceeding?

A Yes, sir.

Q And, in fact, he did?

A Yes, sir.

Q What, if anything, did you or your husband say to Walter [Bradsky] or Mr. Porter at that time?

A Well, nothing really. It was just assumed the papers would be handed over to Mr. Porter and he would proceed.

Q You agreed to have Kurylas Inc.'s interest in the property at the motel represented by Mr. Porter at that time?

A Yes, sir.

Q And from there on out it's fair to say that Mr. Porter and his firm represent Kurylas Inc.'s interest in the property, the motel?

A Primarily, yes.

Q Well, you were dependent upon Mr. Porter's representation in Kurylas Inc.'s interest in that property, correct?

A Yes.

Q He was the one who was drafting the documents, correct?

A Yes, sir.

Q He was the one who you would go up and visit in his office, correct?

A Yes, sir.

Q He was the one that was sending you his bills and you were paying those bills, correct?

A Yes, sir.

Her testimony also includes admissions that Bradsky was not involved in the day to day transactions.

Mr. Kurylas recalled fewer dates and events but basically agreed with his wife's testimony. He admitted that Costello, Porter picked up the representation relating to the motel while Bradsky represented Kurylas on other matters. Bradsky does not dispute the contacts between himself and Costello, Porter. Bradsky had much information to convey and the family contacts kept him interested in these transactions.

The burden is on Kurylas to establish the continuous representation doctrine. This was established in *Glad, supra:*

[I]n summary judgment proceedings where the defendant asserts the statute of limitations as a bar to the action, and presumptively establishes the defense by showing the case was instituted beyond the statutory period, the burden then shifts to the plaintiff to establish the existence of material facts in avoidance of the statute of limitations, e.g., fraudulent concealment of the cause of action.

*Glad, supra,* at 682; *see McMahan v. Snap On Tool Corp.,* 478 N.E.2d 116, 120 (Ind.App.1985); and *Conard v. Waugh,* 474 N.E.2d 130, 134 (Ind.App.1985). This applies to the continuous representation doctrine as well. It simply was not recognized in South Dakota at the time *Glad* was written. Kurylas should bear the same burden when trying to toll the statute of limitations by using the continuous representation doctrine *or* fraudulent concealment.

The statements presented do not overturn the presumption that the statute of limitations has run. Kurylas has not established that there was any tolling of the statute. The standard of *Schoenrock, supra,* regarding continuous representation is not met. Therefore, the summary judgment is affirmed.

WUEST, C.J. and MORGAN, J., concur.

SABERS, and MILLER, JJ., dissent.

DOBBERPUHL, Circuit Judge, for HENDERSON, J., disqualified.

SABERS, Justice (dissenting).

I dissent.

The complaint alleges that Bradsky represented Kurylas on June 11, 1983, and

"continued up to November 13, 1984 and beyond. An attorney-client relationship existed." The complaint further alleges that Bradsky "negligently failed to possess and exercise that degree of knowledge and skill ordinarily possessed and exercised by lawyers engaged in the legal profession...." As a proximate result of this negligence, Kurylas sustained damages.

On or about November 7, 1984, Kurylas became disillusioned that the litigation bogged down in bankruptcy proceedings, and went to see Attorney Joe Butler. At that point in time, Attorney Butler "hadn't agreed to get in the case," but "raised the question [whether] a financing statement [had] been filed." When Wilma Kurylas left Butler's office that day, she went to Bradsky's office. Bradsky is her brother. She testified:

Q. What did you say to him and what did he say to you, if anything?

A. I said, "Are you sure it hasn't been filed?" And so Walter was at that point looking through his file, and he said, "No, it has not been."

Q. Anything else said?

A. I said, "Do you want to do that, or do you want me to take it up to the Courthouse or what?" *He said he would handle it, and he did.* (emphasis added).

When Bradsky found the unfiled financing statement in his file, he knew or should have known that Kurylas, Inc., had an unperfected security interest in the motel property collateral. He either knew or should have known that any creditor of Ceasar's, Inc., could perfect a security interest in the motel collateral of Kurylas, and thereby take priority over the unperfected security interest of Kurylas. He testified that he knew that the motel "had changed hands so many times, and I felt each time there should have been a separate financing statement and security agreement."

If the foregoing testimony is disputed, then there is a fact issue for the jury, and summary judgment is improper. If the foregoing testimony is undisputed, then the undisputed evidence is that Bradsky "said he would handle it," and had the responsibility of proceeding to perfect the security interest in favor of Kurylas.[1] At the least, whether his offer to "handle it" constitutes continuing legal representation is a jury question.

Since the Defendant's malpractice "occurred"[2] on November 7, 1984, and the

---

1. Kurylas suggests that this could have been accomplished by Bradsky by either obtaining new financing statements executed by Ceasar's, or by filing a copy of the settlement agreement of February 9, 1984, and the exchange agreement of June 11, 1983, in lieu of a financing statement. SDCL 57A–9–402(1) provides that a "copy of the security agreement is sufficient as a financing statement if it contains the above information and is signed by the debtor."

2. I am concerned about this court's overly restrictive interpretation of "occurrence." We would be well served to abandon the outdated interpretation used by the majority. As explained in 2 Mallen and Smith, *Legal Malpractice* § 18.10 at 100 (3d ed. 1989):

> [P]roblems with the occurrence rule account for its abandonment or amelioration in almost all jurisdictions. The perseverance of the rule is more attributable to its deep historical roots rather than its logic.

Mallen and Smith proceed to explain one way for courts to address these problems of the occurrence rule:

> The obvious injustices and frequently illogical results from application of the occurrence rule have prompted many courts to add the requirement that there be actual injury before a cause of action accrues.

*Id.,* § 18.11 at 100.

Idaho has a statute similar to ours and has adopted this approach. Their statute provides that for professional malpractice "the cause of action shall be deemed to have accrued as of the time of the occurrence, act or omission complained of...." Idaho Code § 5–219(4) (1979). The Supreme Court of Idaho has ruled that "until some damage occurs no cause of action accrues for professional malpractice, even though the 'occurrence, act or omission complained of,' which ultimately causes the damages, has occurred earlier." *Treasure Valley Bank v. Killen & Pittenger, P.A.,* 112 Idaho 357, 359, 732 P.2d 326, 328 (1987). Such a conclusion is consistent with the generally recognized proposition that a statute of limitations does not "begin to run against a negligence action until some damage has occurred." Prosser and Keeton The Law of Torts, § 30 at 165 (5th ed. 1984).

We should interpret "occurrence" to require actual injury before the limitation period begins to run. Otherwise, our interpretation of "occurrence" will unconstitutionally collide with our

within action was commenced on October 30, 1987, it was within the three-year statute of limitations contemplated by SDCL 15–2–14.2. It was not until December 13, 1984—the date Rushmore State Bank filed its financing statement against Ceasar's, who acquired its interest from Kiser's Rapid City Motel Co.—that the "proposed" action of Bradsky would become ineffective as "too late."

Whether Bradsky continued to represent Kurylas up until November 10, 1987, when he gave Kurylas a "notice of withdrawal," terminating the attorney-client relationship is another jury question. An attorney-client relationship can clearly continue to exist even though other attorneys may have been retained to handle "bankruptcy proceedings," "trial matters" or other special aspects of a transaction. Therefore, genuine issues of material fact exist concerning the attorney-client relationship, continuing representation, and negligence. *Schoenrock v. Tappe,* 419 N.W.2d 197 (S.D. 1988); *Wells v. Billars,* 391 N.W.2d 668 (S.D.1986). Since genuine issues of material fact exist concerning these matters, summary judgment was clearly improper. *Groseth Int'l, Inc. v. Tenneco, Inc.,* 410 N.W.2d 159 (S.D.1987); *Bego v. Gordon,* 407 N.W.2d 801 (S.D.1987); *Wilson v. Great N. Ry. Co.,* 83 S.D. 207, 157 N.W.2d 19 (1968).

MILLER, Justice (dissenting).

I generally join Justice Sabers' dissent. I do not, however, join his footnote 2. This is not the time or the case to review our interpretation of the "occurrence rule."

decision in *Staab v. Cameron,* 351 N.W.2d 463 (S.D.1984), and other similar cases. The unconstitutional collision will arise where the injury from the malpractice does not exist until more than three years after the act of negligence. In accord with *Staab,* during the first three years the injured party would be unable to obtain a remedy for the injury because "an attorney is liable in a malpractice action only for losses actually sustained as a proximate result of the conduct of the attorney." *Id.* at 466. By the time the injury arises, our interpretation of "occurrence" would bar an action to recover for the injury. The end result would be the complete denial of a remedy for an injury in violation of Article VI, § 20 of the South Dakota Constitution. *See Zacher v. Budd Co.,* 396 N.W.2d 122 (S.D.1986). While the facts of this case do not present such a situation, we should take advantage of the opportunity to correct the problem and avoid the collision of our decisions.